# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40411**

————————————

**UNITED STATES**
*Appellee*

v.

**Luke A. SCOTT**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 October 2024

————————————

*Military Judge*: Matthew P. Stoffel.

*Sentence*: Sentence adjudged on 3 May 2022 by GCM convened at Misawa Air Base, Japan, and Buckley Space Force Base, Colorado. Sentence entered by military judge on 8 July 2022: Dishonorable discharge, confinement for 30 months, and reduction to E-1.

*For Appellant*: Major David L. Bosner, USAF; Major Alexandra K. Fleszar, USAF; Captain Michael J. Bruzik, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel G. Matthew Osborn, USAF; Major Olivia B. Hoff, USAF; and Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and MASON, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge MASON joined. Judge DOUGLAS filed a separate dissenting opinion.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

Contrary to his pleas, a general court-martial composed of officers found Appellant guilty of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, and one specification of assault consummated by a battery and one specification of aggravated assault by strangulation, both in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1] These convictions involved the same victim, JK. Consistent with his pleas, the same court-martial found Appellant not guilty of one specification of abusive sexual contact, in violation of Article 120, UCMJ; two specifications of assault consummated by a battery, in violation of Article 128, UCMJ; and one specification of indecent conduct, in violation of Article 134, UCMJ, 10 U.S.C. § 934. These findings of not guilty involved a different individual, CG. The trial judge sentenced Appellant to a dishonorable discharge, confinement for 30 months, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.[2]

Appellant raises eight issues on appeal which we have reworded: (1) whether the military judge erred when he denied the defense motion to suppress Appellant's statements taken in violation of Article 31, UCMJ, 10 U.S.C. § 831, by a victim, JK, who was also a "trusted agent" of the drug demand reduction program (DDRP) and a member of the commander's support staff; (2) whether the court-martial lacked jurisdiction because there were no exigent circumstances justifying one-half of the panel members being from a different armed service, the Space Force; (3) whether the evidence was legally sufficient to support Appellant's conviction for aggravated assault consummated by a battery in the form of strangulation; (4) whether the evidence was factually sufficient to support each of Appellant's convictions; (5) whether trial counsel committed prosecutorial misconduct by shifting the burden during closing argument in asserting to the members panel that Appellant had the burden of proving consent; (6) whether Appellant is entitled to relief for unreasonable post-trial delay in the docketing of his case with this court in accordance with *United States v. Livak*, 80 M.J. 631 (A.F. Ct. Crim. App. 2020); (7) whether the military judge erred by denying a defense request for a jury instruction for

---

[1] All references in this opinion to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] Pursuant to Appellant's request, the convening authority waived the automatic forfeitures for six months or until his date of separation, whichever was sooner, and directed the total pay and allowances be paid for the care of his dependent child.

unanimous verdict; and (8) whether Appellant's sentence was excessive.[3] We address another issue, (9) whether Appellant is entitled to relief for unreasonable post-trial delay in the processing of his appeal in accordance with *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or in the alternative, *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). We address issues (6) and (9) together since they both concern post-trial delay.

With respect to issues (2), (4), and (7), we have carefully considered Appellant's contentions and find they do not require discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023) (upholding the constitutionality of non-unanimous court-martial verdicts pursuant to Article 52, UCMJ, 10 U.S.C. § 852), *cert denied*, 144 S. Ct. 1003, 218 L. Ed. 2d 21 (2024).

Finding no error that materially prejudiced Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND[4]

By Autumn 2019, both Appellant and JK[5] were assigned to a security forces squadron at Misawa Air Base (AB), Japan. Appellant was an instructor with combat arms training and maintenance (CATM). JK was a personnelist assigned as the noncommissioned officer-in-charge (NCOIC) of the commander's support staff (CSS). Her duties included administering command issued orders for unit members to submit to urinalysis testing. The CSS was located in the same building as the squadron commander's office. Appellant and JK were acquaintances.

In the evening of 28 September 2019, JK parked her car outside the main gate of Misawa AB. After socializing with friends and drinking alcohol on base, JK considered her options about how to get to her home off-base. Appellant happened to walk by her at this time. He had been drinking with friends off base but lived on base. JK asked Appellant if she could stay on his couch for the night, believing him to be a "trustworthy defender." They walked to the

---

[3] Appellant personally raises issue (8) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] The information in the Background section is taken from JK's version of events in her sworn testimony at trial.

[5] By the time of trial, this victim's last name had changed. To avoid confusion, she is referred to in this opinion by the initials of her name as it appears on Appellant's charge sheet.

club on base to get a ride to his residence through the Airmen Against Drunk Driving volunteers.

Once at Appellant's home, he gave her a blanket and pillow for the couch, and then suggested she sleep with him in his bed. She agreed. After moving to his bedroom, they kissed consensually. Appellant moved his hands to her pants while she was still fully clothed. She told him to "stop" and she was "not there for sex." He "laughed" and "began to wrestle with [her] on the bed." She held her hand on the "button and zipper" of her "skinny jeans" so that "he could not get into [her] pants." JK felt "relieved" when Appellant eventually stated he was "tired" and suggested they "go to bed."

Appellant handed JK athletic shorts to wear. She then removed her own pants and put on his shorts because she was "pretty hot." Appellant got back into bed, suggesting he had a "second wind." He moved JK on top of him, straddling him. Then he "put his hand on her throat and started squeezing." As the squeezing became "tighter," she put her forearm into his chest, and he used his other arm "to pull her down." Appellant then let go of her throat and inserted one of his fingers into her vagina under her shorts. She "couldn't move because he was holding [her] down with his other arm." After about five to ten seconds, she was able to put her knee "into his gut." To prevent him from penetrating her again, she used her legs to "wrap" around him and "interlocked her ankles." He continued to "roll [her] back and forth." This "tired him out[.]" Appellant stated, "Fine, I guess, I won't rape you." JK responded, "Gee, thanks." Appellant then told her, "But we will have sex in the morning." Upon hearing this, JK "knew [she] had to get out of there." She left and returned home after Appellant fell asleep. We detail additional facts in our discussion sections *infra*.

## II. DISCUSSION

### A. Motion to Suppress Appellant's Statements

Appellant claims that the military judge erred when he denied a defense motion to suppress Appellant's statements made to JK on 20 January 2021.

#### 1. Additional Background

##### a. *JK and Appellant Text Messages, 29 September 2019*

We begin by describing statements Appellate made to JK the day after the 28 September incident. The following day Appellant reached out to JK on social media with a question.

[Appellant:] You good[?]

[JK:] You're an [*]ss hole. I'll be fine.

[Appellant:] Whoa whoa. Explain[.]

[JK:] You got too intense and I even told you that and to stop. That was scary as f[**]k for me.

[Appellant:] I'm really sorry, I wasn't trying to be too intense[.]

[JK:] I really didn't go home with you expecting to hook up at all. I thought I could trust you [because] you're a great guy. And I know it was my decision and my decision to get in your bed. But you didn't listen.

[Appellant:] Yeah[,] I guess I might have read different signs last night. You can trust me, but I guess I was on a different page. I didn't mean to hurt you.

[JK:] I know[.]

. . . .

[Appellant:] What can I do I guess to make it up to you? Try to prove I'm not a bad guy[?]

[JK:] Never do that to anyone again[.]

JK did not report this incident to anyone. JK and Appellant generally avoided each other over the next year until they found themselves together in the fall of 2020 at the "gun station" during a pre-exercise event with fellow unit members. JK heard Appellant say, "Oh, well, I can't touch the guns." She suspected Appellant might be under investigation for sexual assault because she knew his job involved firearms training where he would be expected to have permission to handle guns. She "tried to figure it out" in her role as the NCOIC of the CSS but couldn't "find anything." She then asked a friend in the base legal office who confirmed Appellant was under investigation for an alleged sexual assault. She told this friend she "believed" the other complainant. Her friend referred her to the squadron "chief," who in turn, referred her to the Air Force Office of Special Investigations (AFOSI).

### b. Appellant's Pretrial Admissions

On 25 November 2020, Special Agent (SA) JB from the AFOSI detachment at Misawa AB attempted to interview Appellant about the allegations made by the other complainant, CG. SA JB advised Appellant of his Article 31, UCMJ, rights related to those suspected offenses.[6] Appellant "initially waived" and then "invoked" his rights.

---

[6] SA JB read Appellant his Article 31, UCMJ, rights for either abusive sexual contact (as SA JB testified) or for unwanted sexual contact (as Appellant stated in his recorded

On 17 December 2020, JK made her own complaint to SA JB about the incident that occurred at Appellant's home on 28 September 2019, more than 14 months earlier. By this time, Appellant had already sought the advice of counsel with respect to CG's allegations. JK felt guilt and shame for not reporting Appellant's conduct earlier because she believed she "could have protected the other victim." JK did not otherwise know CG.

JK agreed to have a "pretext" conversation with Appellant in which she arranged for him to come to her office under a ruse that he was required to take a command-directed urine test. This ruse required Appellant to report to JK to retrieve necessary paperwork required to process his urine test. As instructed, Appellant reported to JK on 20 January 2021, during which he engaged in a 16-minute conversation with JK that was both audibly and visually recorded by AFOSI. Appellant and JK had the following exchange.

> [Appellant:] Hey.
>
> [JK:] Hi, can you close the door?
>
> Appellant: Of course.
>
> [JK:] Ok, so I'm a true believer that everything happens for a reason.
>
> [Appellant:] Ok?
>
> [JK:] [W]hen we were at the ATSO[7] rodeo and you mentioned that you were "do not arm . . . "
>
> [Appellant:] Yeah.
>
> [JK:] Got me thinking, why are you "do not arm[?]"
>
> [Appellant:] Yeah.
>
> [JK:] So, I did research.
>
> [Appellant:] Ok?
>
> [JK:] I didn't find anything. Then I see the involuntary DEROS[8] extension. So now, I'm getting more worried, right?
>
> [Appellant:] Yeah.

---

conversation with JK). The trial judge determined it was for "assaulting CG" in his findings of fact.

[7] Ability To Survive and Operate.

[8] Date Estimated Return from Overseas.

[JK:] Because that means no one around the squadron knows what's going on.

[Appellant:] Yeah.

[JK:] So that means it's probably pretty bad.

[Appellant:] Yeah.

[JK:] Ok . . . so . . . I . . . for my own like . . . self . . .

[Appellant:] Yeah.

[JK:] I need to . . . get this out of the way, because I've been like, like, I'm shaking. So, I've been like, holding this in . . . and like, I didn't want to do it at work . . . but I mean we don't hang out outside of work.

[Appellant:] Yeah.

[JK:] But, like, I just need to know if it was involving another female. Like what happened with you and me?

[Appellant:] No.

[JK:] It didn't?

[Appellant:] But . . . it involved another female.

[JK:] Alright, so . . . it wasn't like what happened with you and me?

[Appellant:] No.

[JK:] At all?

[Appellant:] Not even close.

[JK:] Ok.

[Appellant:] Like, if it . . . if . . . is [(sic)] there microphones in here? Just makin' sure.

[JK:] Do you want to search me? Don't do that . . . don't.

[Appellant:] Stop. Because what happened with us that one time was worse than what's going on right now. Like, you and I was worse. What's going on right now is f[**]king bulls[**]t.

. . . .

[JK:] So, like, for my peace of mind, and so I can like, finally, like forgive you . . . and move on, because I've been holding on to it.

> [Appellant:] No, and so . . . I f[**]ked up, right? And felt really bad and never really apologized and . . . haven't done anything . . . I've hung out with two females since we've hung out.

JK continued to question Appellant, telling him to "promise" he never "wrestle[d]" with CG, "h[e]ld her down," or "choke[d] her," similar to what he had done to JK, and that CG did not say "no" like JK "did." Appellant adamantly denied the comparison and denied misconduct with CG.

> [Appellant:] No!
>
> [JK:] Do you promise?
>
> [Appellant:] Yes.
>
> [JK:] Because if I f[**]king find out . . .
>
> [Appellant:] Did OSI talk to you?
>
> [JK:] No.
>
> [Appellant:] Oh.
>
> . . . .
>
> [JK:] What you did to me was wrong.
>
> [Appellant:] Yeah. No, I one hundred percent agree.
>
> [JK:] Ok.
>
> [Appellant:] So, I never formally apologized for that.
>
> [JK:] No, you didn't.
>
> [Appellant:] Sorry.
>
> [JK:] But you did say you'd never do it again.
>
> [Appellant:] I didn't—haven't.

JK, without asking Appellant to elaborate, or specify what he was apologizing to JK for specifically, continued to ask Appellant details of what might have occurred with the other complainant, CG.

> [JK:] What did she say?
>
> [Appellant:] Unwanted sexual contact, is the charge . . .

Appellant explained to JK that he had to "go to [AF]OSI. . . . They were, like . . . asking [him] questions."

When the conversation turned back to the relationship between JK and Appellant over the past year, they agreed they had kept their distance, but had been professional around the work centers.

[Appellant:] You have those looks like "don't talk to me."

[JK:] Yeah, yeah. I don't f[**]king trust you. Oh, he's here.

[Appellant:] Yeah, which is fine. But just know I've been better.

[JK:] Well, that's reassuring.

[Appellant:] Yeah.

[JK:] If I find out it's been any worse, I'm gonna be really f[**]king pissed though.

Appellant and JK continued to discuss the investigation against him for the assaults CG alleged, and how the command might respond. Appellant suggested CG's allegations were "false." He stated that as soon as he gets "her" statement, he intends to "take it to the ADC [area defense counsel]."

[JK:] Maybe it's because [CG] was trying to get more?

[Appellant:] I don't know . . . .

Appellant explained to JK how he and CG met, and how Appellant was choosing to not discuss this investigation with anyone.

[JK:] Yeah, I'm not gonna say anything, because then my s[**]t's gonna come out.

At 11 minutes and 18 seconds into the recorded conversation, Appellant explained that the ADC told him about what process and paperwork to anticipate. Appellant also discussed how the investigation might be holding up his move to his next assignment.

[JK:] Well, I feel better.

[Appellant:] I'm glad.

[JK:] It only took two years.

[Appellant:] I know.

[JK:] I mean I still f[**]king hate you but . . . .

[Appellant:] It's fine.

[JK:] I feel better. You really don't have to pee.

When JK said this, 12 minutes and 28 seconds had passed since Appellant first walked into the office.

[Appellant:] Oh really?

[JK:] Yeah.

[Appellant:] You son of a b[**]ch.

[JK:] Yeah. I just needed you to come over here.

[Appellant:] I was so pissed. I was like, this is the third time in two f[**]king months.

. . . .

[Appellant:] Are we ok now?

[JK:] I mean, I still f[**]king hate you.

[Appellant:] That's fine.

[JK:] So, we're pretty much on the same level, I just feel better.

Appellant and JK continued conversing for another three minutes and 19 seconds.

### c. Defense Motion to Suppress

The Prosecution gave proper notice pursuant to Mil. R. Evid. 304(d) of Appellant's statements to JK. On 29 March 2022, the Defense filed a timely motion to suppress these statements, pursuant to Article 31, UCMJ, Rule for Courts-Martial (R.C.M.) 905(b)(3), and Mil. R. Evid. 304(f). The Prosecution had the burden to establish by a preponderance of the evidence that the statements were voluntary and therefore admissible. Mil. R. Evid. 304(f)(6)–(7). The Prosecution called two witnesses at the motions hearing, SA JB and JK.

SA JB testified he was the lead case agent for AFOSI in this investigation. He explained a pretext conversation is an investigative step "typically used for either a victim or a cooperating witness to . . . have a conversation with an accused person of an investigation in an effort to . . . get the accused person to talk about the matter investigated." SA JB further testified he and another agent "sat down" with JK after she made her initial report. They "explained . . . how her incident . . . occurred over . . . a year prior to our interview" and told her "it would be a big help to the investigation if she was willing to . . . participate in . . . a pretext."

JK agreed, however, she was not considered a confidential informant and did not receive any special training. AFOSI then met with her to discuss safety precautions and generally how JK "thought the conversation might go." They "practiced possible conversations" but did not teach JK any interrogation techniques or provide any specific questions to ask Appellant. SA JB informed JK "other women" had come forward "with similar experiences" but did not share details or direct her to obtain any particular information. Notably, AFOSI did not inform JK of Appellant's previous interview or decision to invoke his rights in the CG matter although the same agent was handling both cases. SA JB sought JK's input on the location of the pretext. JK offered to use her office and role as a trusted agent in the DDRP.

At the motions hearing, SA JB confirmed Appellant invoked his right to counsel when SA JB interviewed him on 25 November 2020 for suspected abusive sexual contact against CG. SA JB testified he believed this meant he would "cease" the interview and "stop questioning [Appellant] as a law enforcement officer."

SA JB confirmed the pretext conversation took place on 20 January 2021, which was after Appellant invoked his right to counsel. SA JB acknowledged there is no policy to advise a target of a pretext conversation of his or her right against self-incrimination, but the main investigative purpose of a pretext conversation is not specifically to "avoid" a rights advisement. SA JB explained he did not think JK needed to advise Appellant of his rights because Appellant "was not in custody," he "could leave" the meeting location, and, in his view, JK was "not acting on behalf of a law enforcement officer." SA JB further testified he did not know whether Appellant had actually spoken with an attorney between the time Appellant invoked his rights concerning CG's allegations and his conversation with JK. He did not inform JK that Appellant had previously invoked his rights concerning a different person's allegations because he did not "see it [as] relevant because [JK] was not acting as a law enforcement person."

SA JB explained that agents placed video cameras in JK's office. He believed the squadron commander and chief master sergeant were also present in their offices on the same floor, but not connected to the CSS where JK had her office. Additional AFOSI agents and security forces members were in an adjacent room.

SA JB also explained the pretext began under the guise of a urinalysis inspection to get Appellant and JK, who had been avoiding each other socially, "in the same place . . . at the same time." The location also allowed AFOSI to "control the traffic coming in" and offer "a little bit of privacy" for Appellant and JK "to talk one on one." SA JB acknowledged he knew the "mandatory" procedures for a military member called to CSS for a urinalysis because he was an active duty Air Force servicemember himself. SA JB further agreed a member who does not appear when called for urinalysis commits a "failure to go" offense under the UCMJ.[9]

JK also testified at the hearing that her role in the CSS was "admin[istrative in nature]." This included doing in- and out-processing, maintaining members' personnel files, and assisting in the fitness program. Although she

---

[9] Article 86, UCMJ, 10 U.S.C. § 886.

worked within security forces, she did not interview other people, wear a beret, or serve any law enforcement role.[10]

JK confirmed she was a "trusted agent" for the DDRP. She explained how she would notify members whose names appeared on daily lists of those scheduled for urinalysis:

> [F]or the majority of the squadron, it was going through their supervisor, so their supervisor could contact them. For higher up leadership, it was . . . going [directly] to them[,] saying[,] "Hey, I need to see you."

JK explained she was "not allowed" to inform a member of the reason to report to the CSS, only that the member needed "to come to our office for a meeting." JK testified Appellant had been previously notified to report to CSS for a urinalysis "a couple of times" since JK had worked there. On those previous occasions, she had immediately presented him with the required paperwork and did not have extended conversations with him.

JK testified how the pretext conversation was set up:

> [T]hey . . . offered up a few situations . . . like . . . being in my car or his car, and I was like that's not really an option, because we are not friends. So, it would be awkward if we were all of a sudden in one another's car. And then, I brought up . . . something that's easy for me to get him over is DDRP, because I do it every day. . . . [H]e could be selected at any time. So, they initially didn't want to do that because I think they didn't know . . . how could we get him over there at a specific time. And, so, I thought it was dropped. And then, I think it was like a week or two later, they were like we're going to roll with that idea. I said, okay.
>
> . . . .
>
> So, then, once the date was actually set, they came over, they put audio and video in my office and that's when I . . . called Sergeant E, who's the CATM NCOIC, to have [Appellant] come over. And then, he came over and we started talking.

JK explained AFOSI had not told her to ask Appellant anything specific.

> [T]hey did say . . . if you can get him to talk about the situation that will be for the best. Try not to . . . lead him into anything.

---

[10] SA JB also acknowledged he knew JK had previously applied to be an AFOSI agent, but he and JK knew she was no longer being considered for such a position by the time she provided her statement to AFOSI and had the pretext conversation with Appellant.

That was pretty much it. I knew if I came at him aggressive, I wouldn't get anything out of him. So . . . I figured it would be better to be like "Hey, we're both in the same boat." So, it was more of [me] trying to make him [believe] that we were friends.

When Appellant arrived, JK did not ask him for his military identification card or give him the written urinalysis order. She stated, however, that if Appellant reported as directed, he could have permissibly "left" her office and "come back later," if he had not signed the written order.

### i. Trial Judge's ruling and analysis

The trial defense counsel argued the statements were taken in violation of Article 31, UCMJ. The Prosecution responded that the statements were not taken in violation of Article 31.

The trial judge denied the defense motion to suppress Appellant's recorded statements to JK. He detailed his ruling and order in court orally. First, the military judge found by a preponderance of the evidence all the essential facts of the pretext conversation outlined above. Then he explained the analysis he conducted in reaching his conclusions of law:

> [T]he [P]rosecution has demonstrated by a preponderance of the evidence that [Appellant's] statements to JK were voluntary. More specifically, the statements were not involuntary, because JK . . . was not required to advise [Appellant] of his Article 31 . . . rights prior to asking questions in which incriminating responses were sought or were the reasonable consequences of such questioning.

The trial judge considered the two-part test as set forth in *United States v. Jones*, 73 M.J. 357 (C.A.A.F. 2014), "for when Article 31 rights advisements are required to be given." First, the military judge considered whether JK was "acting in an official capacity or through personal motivation," and second, whether "a reasonable person" would consider JK "to be acting in an official law enforcement or disciplinary capacity."

The trial judge concluded the first prong resulted in Appellant's favor. Specifically, that JK was assisting AFOSI and, therefore, she was acting in an official capacity even if she had also some personal motivation behind her assistance. The trial judge concluded, however, that the second prong resulted in the Prosecution's favor. Specifically, that a reasonable person would not consider JK to be acting in an official law enforcement capacity.

The trial judge reasoned the Defense did not meet the second part of the *Jones* test because JK "was an admin[istrative] troop with no law enforcement training. She did not perform law enforcement duties at Misawa Air Base.

13

[Appellant] was aware that JK's duties were administrative in nature and [did] not include law enforcement." Additionally, the military judge found "a reasonable person in [Appellant]'s position would not have concluded that JK was acting in a disciplinary capacity during her questioning[.]"

In particular, the military judge explained JK was not superior to Appellant in rank, the urinalysis program is not a disciplinary program, and JK's questioning would not lead a reasonable person to feel "compelled to speak" with her in exchange for being allowed to leave the CSS office. The military judge found JK "did not connect in any way the need for [Appellant] to answer questions prior to being allowed to depart the office to provide a urine sample."

Furthermore, the military judge's ruling specifically referenced *United States v. Rios*, 48 M.J. 261 (C.A.A.F. 1998), a case where the accused's superior officer, acting at the direction of military investigators, told the accused to call his stepdaughter as part of a pretext phone call operation to see if the accused would incriminate himself about the stepdaughter's allegations of sexual abuse. In *Rios*, our superior court held that the accused's statements to his stepdaughter during the ensuing phone conversation were voluntary.

In this case, the military judge stated that he found *Rios* "instructive" on his consideration of whether the order to report to JK for DDRP purposes had any effect on the subsequent conversation. Drawing a comparison to *Rios*, the military judge concluded, "[W]hile a reasonable person may have concluded that the reason for reporting to [JK] was related to providing a urine sample ordered by the [Appellant]'s commander, it had no effect on [Appellant's] subsequent conversation with [JK]."

### ii. Prosecution's use of Appellant's pretrial admissions

After the trial judge denied the defense motion to suppress, the Prosecution offered the recording of the pretext conversation as evidence (Prosecution Exhibit 7). The Prosecution played a portion of this exhibit during its opening statement and emphasized Appellant did not deny JK's accusations but quoted "I f[**]ked up" as an admission of misconduct. The exhibit was published to the members and played in its entirety during JK's in-court testimony, allowing her to address aspects of the various portions of the recording. In closing argument, the Prosecution encouraged the members to watch the recorded conversation "as many times as you need to" and "jack up the volume if you can't hear it using the up arrows on the computer. Turn it up as loud as you need to."

Furthermore, the Prosecution argued to the members that the investigators' use of the pretext conversation comported fully with the law.

> . . . Keep in mind that you may consider whether or not this statement was taken in violation of an Article 31, UCMJ[.]

Now, as you're thinking about that, again, focus on the evidence, in this case. There w[ere] some questions about what is Article 31 and did [JK] need to read him his rights. She told you, no, that she didn't think she had to read him any rights. And that simply there was no evidence that the statement actually was taken in violation of any right to remain silent. Right?

A police officer certainly would understand that person's legal rights, and if [Appellant] chose [he] could have simply remained silent. Was this coercive or forced? Sure. . . . [S]he used this urinalysis testing ruse to get him to come to that CSS office. But once he enters that office, right, he's not given the order. . . . This is a conversation between two peers, people of equal rank that don't have an ongoing relationship . . . .

### iii. Article 31, UCMJ, Instruction to the Members

With agreement from trial defense counsel, the trial judge provided an instruction to the members before closing arguments regarding whether JK should have provided Article 31, UCMJ, rights advice to Appellant prior to questioning him.

A pretrial statement by the accused has been admitted into evidence as Prosecution Exhibit 7. The [D]efense has introduced evidence that the accused's statement may have been obtained in violation of Article 31, UCMJ. You must decide the weight or significance, if any, such statement deserves under all the circumstances.

In deciding what weight or significance, if any, to give to the accused's statement, you should consider the specific evidence offered on the matter, your own common sense and knowledge of human nature, and the nature of any corroborating evidence, as well as the other evidence in this trial.

### 2. Law

### a. Standard of Review

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Bishop*, 76 M.J. 627, 641 (A.F. Ct. Crim. App. 2017) (citing *Jones*, 73 M.J. at 360). When there is a motion to suppress a statement on the ground that Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights' warnings were not given, we review the military judge's findings of fact for clear error and we review conclusions of law de novo. *Id.* Whether a questioner was acting or could reasonably be considered to be acting in a law enforcement or

disciplinary capacity is a question of law requiring de novo review. *Jones,* 73 M.J. at 361.

"An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

"The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *Lloyd*, 69 M.J. at 99 (citing *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)) (additional citation omitted).

"[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). "An abuse of discretion means that 'when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the [trial court] committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors.'" *United States v. Carpenter*, 77 M.J. 285, 289 (C.A.A.F. 2018) (alteration in original) (citing *Gore*, 60 M.J. at 187).

"In reviewing a military judge's ruling for abuse of discretion . . . we review the record material before the military judge." *Lloyd*, 69 M.J. at 100. In reviewing a ruling on a motion to suppress, appellate courts consider the evidence in the light most favorable to the prevailing party. *United States v. Blackburn*, 80 M.J. 205, 211 (C.A.A.F. 2020).

### b. Confessions and Admissions, Mil. R. Evid. 304

A statement is involuntary if "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution,[11] Article 31, [UCMJ,] or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(a)(1)(A). Any "involuntary statement from an accused, or any evidence derived therefrom, is inadmissible at trial" except for limited purposes. Mil. R. Evid. 304(a).[12]

---

[11] U.S. CONST. amend. V.

[12] A statement obtained in violation of Article 31, UCMJ, or Mil. R. Evid. 305(b) or (c) may be used only to "impeach by contradiction the in-court testimony of the accused" or "in a later prosecution against the accused for perjury, false swearing, or the making of a false official statement." Mil. R. Evid. 304(e).

A "confession" is defined as an "acknowledgement of guilt." Mil. R. Evid. 304(a)(1)(B).[13] An "admission" is defined as a "self-incriminating statement falling short of an acknowledgment of guilt, even if it was intended by its maker to be exculpatory." Mil. R. Evid. 304(a)(1)(C).

### c. Article 31, UCMJ, and Mil. R. Evid. 305

"No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him." Article 31(a), UCMJ, 10 U.S.C. § 831(a). Specific to Appellant's statements to JK, Article 31(b), UCMJ, articulates this prohibition as follows.

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." 10 U.S.C. § 831(d).

In the context of Article 31, UCMJ, "interrogation" is defined "as any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil. R. Evid. 305(b)(2).

"Congress did not intend a literal application" of Article 31(b), UCMJ. *United States v. Duga*, 10 M.J. 206, 208–09 (C.M.A. 1981). "[T]here is a definitely restrictive element of officiality in the choice of the language 'interrogate, or request any statement' . . . for military persons not assigned to investigate offenses, do not ordinarily interrogate nor do they request statements from others accused or suspected of crime." *United States v. Gibson*, 14 C.M.R. 164, 170 (C.M.A. 1954) (citation omitted). "Therefore, . . . the Article applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry." *Duga*, 10 M.J. at 210 (citing *Gibson*, 14 C.M.R. at 170), *overruled on other grounds by Jones*, 74 M.J. at 361–62.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an

---

[13] Whether the Appellant's pretrial statements are appropriately characterized as "admissions" or "confessions" was not at issue at trial and is not at issue in our opinion.

accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected. *Jones*, 73 M.J. at 361 (citing *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006)). The *Jones* court adopted a two-part test: (1) whether the person who conducted the questioning was "participating in an official law enforcement or disciplinary investigation or inquiry" as opposed to a personal motivation; and (2) whether a reasonable person assessing all the facts and circumstances at the time of the interview would conclude that the questioner was acting in an official law enforcement or disciplinary capacity. *Id.* at 362. *Jones* applies an objective standard to this second prong of the test. *Id.*

In a footnote, the *Jones* court further elaborated "this objective standard on its face is potentially problematic" when applied "in relation to the use of undercover officers or informants who clearly act in an official capacity." *Id.* at 361 n.5. "This conclusion is consistent with the [United States] Supreme Court's undercover agent exception in the . . . context" of the rights afforded a suspect under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Id.* (citing *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present[.]").

### d. Custodial Interrogations and Mil. R. Evid. 305

In *Miranda*, the Supreme Court held that under the Self-Incrimination Clause of the Fifth Amendment, no statements are admissible in cases involving custodial interrogation unless the law enforcement officers involved first provided four "procedural safeguards" by advising the accused: (1) of the right to remain silent, (2) any statement that is made can be used as evidence, (3) the right to the presence of an attorney, and (4) the right to appointed counsel if indigent. 384 U.S. at 444.

Under the Military Rules of Evidence, "[c]ustodial interrogation" is defined as "questioning that takes place while the accused or suspect is in custody, could reasonably believe himself or herself to be in custody, or is otherwise deprived of his or her freedom of action in any significant way." Mil. R. Evid. 305(b)(3). For constitutional purposes, the definition is substantially the same. *See, e.g.*, *United States v. Schake*, 30 M.J. 314, 318–19 (C.M.A. 1990). Interrogation may be custodial when accused was "under constant police supervision" and told "he was not free to leave[.]" *United States v. Catrett*, 55 M.J. 400, 404 (C.A.A.F. 2001) (internal quotation marks omitted).

The test for custody is objective. *Stansbury v. California*, 511 U.S. 318, 323 (1994). The subjective views of the interrogator and the suspect are irrelevant. *Id.*

Two inquiries are essential to a custody determination. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). To be considered in custody for *Miranda* purposes, a reasonable person in an accused's position must have believed he or she was subjected to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The Supreme Court has looked to several factors when determining whether a person has been restrained (also described as restricted from leaving or not having freedom to depart the environment), including: (1) whether the person appeared for questioning voluntarily; (2) the location and atmosphere of the place where questioning occurred; and (3) the length of the questioning. *See Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977).

### e. Prejudice

Statutory violations rising to the level of constitutional violations must be tested for prejudice under the "harmless beyond a reasonable doubt" standard. *United States v. Evans*, 75 M.J. 302, 305 (C.A.A.F. 2016) (citing *United States v. Brisbane*, 63 M.J. 106, 116 (C.A.A.F. 2006)).

A constitutional error is harmless beyond a reasonable doubt when it did not contribute to Appellant's conviction or sentence. *United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016) (citing *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). An error is not harmless beyond a reasonable doubt, however, when there is a reasonable possibility the error might have contributed to the conviction. *Id.* at 357–58 (citing *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (citation omitted)). The party benefiting from a constitutional error bears the burden of demonstrating the error was harmless beyond a reasonable doubt. *United States v. Kreutzer*, 61 M.J. 293, 300 (C.A.A.F. 2005) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### 3. Analysis

We review the military judge's ruling denying Appellant's motion to suppress his statements to JK for an abuse of discretion. We begin our analysis by noting that neither party challenges the military judge's findings of fact. Upon our review of the record, we agree that the military judge's factual findings are supported by the record and are not clearly erroneous. We also find the military judge's ruling properly cited the applicable law; therefore, the only question we must answer is whether the military judge correctly applied the law to the facts of this case.

In the military judge's ruling, he applied the two-part test from *Jones*. Concerning the first prong—whether the person who conducted the questioning

was participating in an official law enforcement or disciplinary investigation or inquiry as opposed to acting based on personal motivation—the military judge found in Appellant's favor. Specifically, on this prong, the military judge concluded that JK was assisting AFOSI and therefore she was acting in an official capacity even if she also had some personal motivation behind her assistance. Appellant does not contend, and we do not find, any issue with the military judge's application of the law to the facts on this prong.

We now move to the second prong of the *Jones* test—whether a reasonable person assessing all the facts and circumstances at the time of the interview would conclude that the questioner was acting in an official law enforcement or disciplinary capacity. The military judge correctly applied an objective standard of a reasonable person in Appellant's position and answered this question in the negative.

Appellant first argues JK's use of her role as noncommissioned officer in charge of the support section was presumptively a command disciplinary role akin to a first sergeant. We disagree.

The record details that even though JK was assigned to a law enforcement unit, everyone, including Appellant, knew she was a personnelist assigned to the unit to perform administrative tasks. This conclusion is supported by the fact that JK did not wear a beret or a law enforcement badge on her uniform. Moreover, JK was not a commander or first sergeant and no one in those roles was present when Appellant arrived to speak with her. As we noted, *supra*, JK did not outrank Appellant or hold any superior position in Appellant's chain of command. JK had no disciplinary capacity regarding the DDRP, but instead was simply the trusted agent who notified members of an order from their commander to provide a urine sample. Finally, on this point, JK did not threaten to withhold DDRP paperwork or threaten anything else DDRP-related in exchange for Appellant having to talk, being able to leave, or obtaining required DDRP documentation. Moreover, JK's tone and manner, including casually leaning against a separate cubicle while laughing and talking to Appellant, would have provided no indication to either Appellant or a reasonable person in Appellant's position that JK was using her position "to compel" Appellant's participation in the conversation.

Next, Appellant argues the military judge's reliance upon *Rios* was misplaced. In *Rios*, the accused stated at trial that he interpreted his commander's statement to call the accused's stepdaughter as an order, but when asked if he thought he would be disciplined if he did not call her, the accused testified the commander was not on his mind. 48 M.J. at 264. Our superior court, in reaching the conclusion that the accused's statement was voluntary, emphasized the fact the accused did not think he was talking to an interrogator or military superior, and that to the extent the accused interpreted the commander's

directive as an order, it had no effect on the appellant's subsequent conversation. *Id.* at 264–65.

Drawing a comparison to *Rios*, the military judge in Appellant's case held that "while a reasonable person may have concluded that the reason for reporting to [JK] was related to providing a urine sample ordered by the [Appellant]'s commander, it had no effect on [Appellant's] subsequent conversation with [JK]." Recognizing that the military judge has a range of choices, we do not find his decision in this case to be outside that range. *See Gore*, 60 M.J. at 187. In fact, we find that while Appellant's supervisor may have told Appellant to go see JK, the supervisor never ordered Appellant to speak to her about his investigation or his prior interactions with JK, or engage in a 16-minute conversation about a variety of other topics. Additionally, our review of the video from this pretext conversation shows Appellant did not appear to be under any pressure, stress, duress, or coercion as he laughed, smiled, and openly talked with JK. It is also worth noting that Appellant in this case specifically asked JK about cameras and microphones in the room. We find this fact informative for two reasons. First, it shows Appellant knew enough to be cautious about what he said. Second, the fact that Appellant thought about it, assessed the situation and decided to speak freely with JK, supports a conclusion that Appellant did not perceive JK to be acting in a law enforcement or disciplinary capacity.

Finally, Appellant argues JK performed an "interrogation" of Appellant. Here, Appellant attempts to create a circumstance where JK questioned Appellant to the point he felt "compelled to answer questions." However, our review of the video shows a relaxed, back-and-forth conversation where Appellant and JK discussed a variety of topics, many of which were voluntarily raised by Appellant. In conclusion, we do not find the trial judge's application of the law to the facts of this case was "'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous,'" and therefore we conclude the trial judge did not abuse his discretion in denying Appellant's motion to suppress his statements to JK. *Lloyd*, 69 M.J. at 99. Since we do not find that the military judge erred, we need not address prejudice.

## B. Legal Sufficiency

Appellant contends his conviction for aggravated assault by strangulation was legally insufficient. Specifically, Appellant argues there was insufficient evidence JK's breathing or circulation were impeded as required for conviction. We disagree and find his conviction legally sufficient.

### 1. Additional Background

During her testimony, JK described what happened in Appellant's bed:

> I just remember him grabbing me and putting me on top of him and . . . my body went limp, because I . . . longer going to just, you know, let this happen.
>
> So, from what I recall is I stopped allowing him to kiss me, because I was still trying to figure out how to get out of the situation. And, of course, I had his shorts on, which they were much larger on me than they would have been on anybody like his size.
>
> So, it made it a lot easier for him to get me on top of him and straddle him. . . . I couldn't really stop him from doing anything at that point.
>
> And then he . . . put his hand on my throat and he started squeezing. And it was—it was getting tighter. I didn't lose consciousness, but it was definitely getting tighter. And I just remember thinking in my mind, like, "He's going to kill me." "He's going to rape me."
>
> . . . .
>
> I put my forearm into his chest to push him away and then he used his other arm to pull me down. And then, when he let go of my throat, he inserted his finger into my vagina. And I couldn't move because he was holding me down with his other arm. And somehow, I got my opposite knee into his gut and I pushed away. And then, like, at that point, I was just really mad and I knew it was going to probably get worse.
>
> . . . .

JK also testified Appellant used one hand on her throat and progressively squeezed tighter. While JK acknowledged Appellant's grip did not completely restrict her breathing, she confirmed his grip made it more difficult for her to breathe.

During her testimony, JK agreed the kiss between her and Appellant was consensual up until the point where Appellant began pulling on her pants, adding, "I started to tell him, 'Stop, Scott; no' multiple times." JK also detailed the other physical actions she took to show Appellant she did not want to have sex. JK stated, "I gripped my zipper and my pants buttons, so he could not get into my pants. But he was trying to move my hand away trying to get in. But I had a death-grip on my pants." JK also testified Appellant tried to take off her shirt.

At trial, the Government also presented testimony from Staff Sergeant (SSgt) AR. SSgt AR testified she was best friends with JK and the two knew each other since basic training. SSgt AR stated that JK attempted twice to

discuss what happened to her at Appellant's apartment. The first conversation occurred close in time to the assault, where, according to SSgt AR, "The only detail [JK] really gave me . . . was that [Appellant] put his hand around her neck, but I didn't want to bother her anymore with any questions," because it was "a sensitive subject." SSgt AR testified, however, that JK later opened up more about what happened between her and Appellant. She stated that JK told her:

> That she was hanging out with [Appellant] at his house. I think they were watching TV—I'm not sure. But they started off with making out and then leading to the bedroom.
>
> . . . .
>
> I think, they were kissing some more, but then he wanted to go further. She said, no, multiple times. And that he got angry and put his hands around her neck and she froze. I remember her telling me that she was afraid for her life and that she would die here. And she ex—she was telling me more that he put his hands in her pants—and put his fingers inside.
>
> . . . .
>
> Inside her body, in her—the vagina, and she froze. But the only way she was able to get out was to say that she was going to throw up, I guess, he finally got off of her. And he said, "I guess I won't rape you this time" and she left.

When later asked what stood out about this conversation, SSgt AR said, "Mainly, the choking. And, him touching her," adding, "her vagina."

### 2. Law

We review issues of legal sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2107) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

"[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). This test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to credibly testify. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt).

As charged, to convict Appellant of aggravated assault by strangulation upon JK, the Government was required to prove beyond a reasonable doubt: (1) Appellant did bodily harm to JK; (2) Appellant did so by strangulation; and (3) the strangulation was done with force and violence. *See* Article 128, 10 U.S.C. § 928.[14]

The military judge defined strangulation as "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of a person by applying pressure to the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim."[15]

### 3. Analysis

Considering the evidence in the light most favorable to the Prosecution, we find that a rational trier of fact could have found the essential elements of the charged offense, aggravated assault by strangulation, beyond a reasonable doubt.

---

[14] At the time of its publication, the 2019 *Manual for Courts-Martial* listed strangulation under Article 128(b), UCMJ, AGGRAVATED ASSAULT. *See MCM*, App. 2, at A2-45. However, the elements for strangulation were not listed in the *Elements* section of Article 128, UCMJ. *See MCM*, ¶ 77.b.(4)(b) (reflecting the absence of strangulation). At the time of Appellant's trial, all parties agreed to the elements for strangulation proposed by the military judge. The same elements were subsequently included in the *Elements* section of Article 128, UCMJ, in the *Manual for Courts-Martial, United States* (2023 ed.) (2023 *MCM*), and in the *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

[15] This definition is consistent with the definition that appears in Article 128, UCMJ, in both the 2023 *MCM* and 2024 *MCM*.

Here, JK's testimony alone established Appellant's guilt. We find a rational trier of fact could have found that JK's testimony meets the definition of "strangulation," as it showed Appellant impeded JK's normal breathing by applying pressure to her throat. We also find other trial evidence, especially the statements Appellant made against his interest to JK, and SSgt AR's testimony corroborated JK's testimony and provided further support for our finding of legal sufficiency.

Nevertheless, Appellant argues the evidence legally insufficient to prove strangulation. He specifically focuses on the fact that JK testified that Appellant's actions: (1) did not prevent her from breathing or obstruct her airway; (2) did not cause her to black out or lose consciousness; and (3) did not impede her ability to speak, highlighting that JK was able to say, "Stop, Scott," while being strangled. We are not persuaded by Appellant's arguments, however, because evidence of losing consciousness, an inability to talk, or a complete inability to breathe are not required to meet the definition of strangulation. Instead, the definition requires only that Appellant impeded JK's normal breathing. Here, we find sufficient evidence from JK's testimony where she specifically stated Appellant's grip on her throat made it more difficult for her to breathe.

In conclusion, looking at the evidence in the light most favorable to the Government, we find sufficient evidence for a rational trier of fact to have found all the elements of the offense of aggravated assault by strangulation beyond a reasonable doubt. Accordingly, we conclude Appellant's conviction is legally sufficient.

## C. Prosecutorial Misconduct

Appellant contends trial counsel committed prosecutorial misconduct by making improper statements during closing argument of the findings stage of Appellant's court-martial. Specifically, Appellant alleges trial counsel improperly argued that it was Appellant's burden at trial to establish consent. Based on our review of the trial record, including the transcript of trial counsel's closing argument, we find no error and Appellant is not entitled to relief.

### 1. Additional Background

During closing argument for findings, trial counsel argued:

> But, Members, it is not reasonable to think that just because a girl agrees to go into a bedroom with you that she is consenting to having sex. There are a variety of forms of activity and these are unfamiliar sexual partners. Right. It's not like they've been in a relationship or flirting or romance has been building and

building. No. These people know each other through work, have a professional relationship.

She is thinking, "Boy, he is the Security Forces member, a law enforcement person, someone that can be trusted, another NCO, someone that can be a good wingman to me and let me crash on the couch."

And he is thinking, "Oh, here is this girl that I'm going to score with, that I get to hook-up with that night." He is thinking with that one-track mind. And so, when—after they begin kissing when she starts to fight his hand away with that death-grip on her pants, when he is trying to pull the hand away when she is saying, "no," he is ignoring every sign. He's thinking, "Oh, come on. You came back with me. We're going to have sex. We're going to have sex." He's laughing at her physical resistance and her verbal signs of stop.

Members, there's no mistake in that moment. But the accused is thinking with that liquid-courage leading to impulsive risky behavior. That alcohol is fueling his desire for sex, and he's thinking with that one-track mind ignoring every other sign that a reasonable person would know there is no consent.

Make no mistake about it, alcohol is no excuse, but it simply explains what was going through his mind and fueling his desires in that moment. He thinks it's go time, but going into someone's bedroom is not consent to have someone strangle you, be flipped around on the bed, to have someone stick a finger in your vagina.

Kissing someone is not consent to be strangled, flipped around, or to have someone place a finger in your vagina. With these unfamiliar sexual partners *the burden is on the* sexual actor, the *accused, in that moment to obtain consent.*

*To act as reasonable diligence* like a normal human being, and *he simply failed to do that.* He thought with his one-track mind trying to have sex with her in spite of all the barriers and everything else that she was saying to the contrary.

(Emphasis added from Appellant's brief).

Appellant contends the italicized portions, *supra*, of trial counsel's argument constituted prosecutorial misconduct. Trial defense counsel did not object to this argument during his court-martial.

**2. Law**

We ordinarily review claims of prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). When, however, no objection is made at the court-martial, the error is forfeited, and we review for plain error. *Id*. By this standard, plain error "occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). "The burden of proof under a plain error review is on the appellant." *Voorhees,* 79 M.J. at 9 (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Id*. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel is entitled to respond to matters raised by an accused or his counsel. *United States v. Gilley*, 56 M.J. 113, 121–23 (C.A.A.F. 2001). Trial counsel "may strike hard blows," but not "foul ones," and may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *Gilley*, 56 M.J. at 121. We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

As our superior court noted in *United States v. McDonald*, Article 120, UCMJ, sexual assault is a general intent offense, where "[c]onsent is to be determined objectively," and "also . . . [f]rom the alleged victim's perspective—consent is his or her *freely given agreement*." 78 M.J. 376, 380 (C.A.A.F. 2019) (citations omitted). Furthermore,

> [t]he burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent. [An a]ppellant's actions could only be considered innocent if he had formed a reasonable

> belief that he had obtained consent. The Government only needed to prove that he had not done so to eliminate the mistake of fact defense.

*Id.* at 381.

It is an appellant's "burden to prove that there is a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 12 (internal quotation marks and citation omitted). "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Id.* (quoting *Fletcher*, 62 M.J. at 184). In assessing prejudice from improper argument, we analyze: "(1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (citation omitted); *Fletcher*, 62 M.J. at 184. In some cases, "the third factor may so clearly favor the [G]overnment that the appellant cannot demonstrate prejudice." *Sewell*, 76 M.J. at 18 (citing *Halpin*, 71 M.J. at 480).

The Court of Appeals for the Armed Forces (CAAF) has identified five indicators of severity of prosecutorial misconduct: "(1) the raw numbers—the instances of misconduct as compared to the overall length of the argument; (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge." *Fletcher*, 62 M.J. at 184 (citation omitted). In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 3. Analysis

Since trial defense counsel did not object to the trial counsel's findings argument during the court-martial proceedings, we review the matter for plain error. Here, when looking at trial counsel's words in the context of the entire argument, we do not find trial counsel improperly argued that Appellant had a burden at trial to prove he had JK's consent. Instead, what the trial counsel argued was that Appellant had the burden, at the time of his actions, to "obtain consent" to the sexual activity. *See McDonald*, 78 M.J. at 381 (finding "[t]he burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent"). We find that this portion of trial counsel's argument was properly discussing why Appellant did not have a reasonable mistake of fact as to consent on that night. Therefore, we do not find any plain or obvious error with trial counsel's argument. *See id.* at 381.

That said, even if we did find plain or obvious error with this argument, Appellant has not demonstrated that he suffered any material prejudice from this argument. We are "confident that the members convicted [A]ppellant on the basis of the evidence alone." *Fletcher*, 62 M.J. at 184.

**D. Excessive Sentence**

Appellant contends his sentence was "excessive given the circumstances" and did not take into account what he characterizes as an otherwise exemplary military career. We disagree and find no relief warranted.

### 1. Additional Background

Appellant elected to be sentenced by the military judge. During the presentencing portion of his court-martial, the Government offered a personal data sheet, consisting of Appellant's service-related data, documentation indicating Appellant had an unfavorable information file, and all of Appellant's performance reports. The performance reports indicated Appellant's satisfactory military service. Additionally, during presentencing, JK presented both oral and written unsworn victim statements detailing how Appellant's crimes have impacted her life.

Appellant's counsel also offered 14 exhibits, including 11 character statements, eight pages of photographs, four pages of Appellant's awards and medals, and a written unsworn statement. The character letters described Appellant as an excellent noncommissioned officer, and military members highlighted many of Appellant's positive character traits and a favorable opinion as to his rehabilitative potential. Additionally, Appellant's counsel presented testimony from Appellant's ex-wife who described him as a caring, thoughtful, and dependable husband and father. Appellant's unsworn statement specifically discussed the importance to him of being able to see his 5-year-old son and becoming a better person.

### 2. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2016) (footnote omitted). We may affirm only as much of a sentence as we find correct in law and fact. Article 66(b), UCMJ, 10 U.S.C. § 866(b). In reviewing judge-alone sentencing, we "must consider the appropriateness of each segment of a . . . sentence and the appropriateness of the sentence as a whole." *See United States v. Flores*, 84. M.J. 277, 278 (C.A.A.F. 2024). We consider each "particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although appellate courts are empowered to "do justice[ ] with reference to some legal

standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

### 3. Analysis

Appellant asks that we reduce his sentence. We are not persuaded that his sentence, to include 30 months' confinement and a dishonorable discharge, is inappropriately severe.

Appellant was convicted of sexual assault, aggravated assault, and assault consummated by a battery, all against another military member. Here, Appellant turned a consensual kissing encounter with JK into repeated acts of violence against her. Appellant attacked JK by grabbing her, wrestling with her, and then grabbing her throat with his hand and squeezing to the point of strangulation. Finally, Appellant placed his finger inside JK's vulva without her consent, all while JK was trying to get away, push him off, and telling him "no." Additionally, in determining whether Appellant's sentence was inappropriately severe, we consider the maximum punishment authorized in this case—dishonorable discharge and confinement for 35 years, six months. This maximum punishment speaks to the seriousness of Appellant's crimes. We also recognize that Appellant's confinement sentence was a fraction of what was authorized, and that the dishonorable discharge was a mandatory minimum segment of Appellant's sentence.

Having considered the nature and seriousness of Appellant's misconduct, and matters contained in the entire court-martial record, including his record of service, all matters submitted in mitigation, and his written and verbal unsworn statements, and having given careful consideration to the appropriateness of each segment of a segmented sentence and the appropriateness of the sentence as a whole, we conclude the adjudged dishonorable discharge, in addition to 30 months of confinement and reduction in rank to E-1, fairly and appropriately punishes Appellant for his misconduct. Therefore, the sentence as entered is not inappropriately severe.

### E. Post-Trial Delay

Appellant further contends he is entitled to relief for unreasonable post-trial delay because his case was not docketed with this court within 150 days of his sentencing. *See Livak*, 80 M.J. at 633. We also address whether Appellant is entitled to relief for unreasonable post-trial delay because our decision was not rendered within 18 months of docketing. *See Moreno*, 63 M.J. at 135. We find no relief is warranted in Appellant's case.

### 1. Additional Background

The military judge sentenced Appellant on 3 May 2022. Appellant's record of trial was docketed with this court 279 days later—on 6 February 2023.

Over Government objection, this court granted Appellant's request for 11 enlargements of time to file his assignments of error brief. In his motion for an eleventh enlargement of time, Appellant's counsel wrote, "Appellant has been advised of his right to a timely appeal, as well as the request for an enlargement of time. Appellant has agreed to the request for an enlargement of time." Appellant filed his brief on 11 March 2024—399 days after the case was docketed. On 10 April 2024, the Government filed their answer to Appellant's brief. On 17 April 2024, Appellant filed a reply brief. This court is issuing its opinion just short of 20 months after docketing.

In support of his argument, Appellant filed a declaration with this court describing how the delay in his appeal has negatively impacted his physical, mental, and social well-being.[16] Specifically, Appellant described suffering anxiety because he has had to live with the stigma of having a conviction and miss important life events with his family while in confinement. Appellant also described being prescribed medication while in confinement to help with his anxiety. Finally, Appellant described his frustration with the length of his appellate process. In response, the Government filed a declaration with this court from SSgt KV, a case paralegal during the post-trial processing of Appellant's case. She provides a timeline for a period of post-trial processing not contained in the record.[17]

### 2. Law and Analysis

"[C]onvicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *Moreno*, 63 M.J. at 135 (citations omitted). We review whether an appellant's due process rights are violated because of post-trial delay de novo. *Livak*, 80 M.J. at 632 (citation omitted).

In *Livak,* this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases, like Appellant's, which were referred to trial on or after 1 January 2019. *Id.* at 633. A presumption of

---

[16] We consider Appellant's declaration in accordance with *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits when the issue is raised but is not fully resolvable by the materials in the record).

[17] We consider SSgt KV's declaration in accordance with *Jessie*, 79 M.J. at 437 (observing a Court of Criminal Appeals is allowed to accept affidavits when the issue is raised but is not fully resolvable by the materials in the record).

unreasonable delay also arises when appellate review is not completed and a decision is not rendered within 18 months of docketing. *Moreno*, 63 M.J. at 142.

If there is a presumptive or an otherwise facially unreasonable delay, we examine using four non-exclusive factors: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "We analyze each factor" and determine "whether that factor favors the Government or appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533).

"No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

We find two facially unreasonable post-trial delays in Appellant's case. First, Appellant's record was not docketed with this court until 297 days after he was sentenced, well over the 150-day threshold established in *Livak*. Second, a decision in Appellant's case was not rendered by this court within 18 months of Appellant's case being docketed.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Moreno,* 63 M.J. at 138–39 (citations omitted). As to the first type of prejudice, where the appellant does not prevail on the substantive grounds of his appeal, as in this case, there is no oppressive incarceration. *Id.* at 139. Similarly on the third type of prejudice, where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. Finally, regarding the second type of prejudice, anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Although Appellant filed a declaration with this court discussing how the delays during his appeal have negatively impacted his life, Appellant has made no showing his particular anxiety and conflict are different from those normally experienced by prisoners awaiting appellate decisions. Since Appellant has not shown prejudice from the delays, there is no due process violation in this case.

Accordingly, we consider whether the delays in this case were so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude they do not.

Although Appellant's record was docketed with this court 297 after sentencing, he made no demands for speedy appellate review until he filed his brief with this court. There is no doubt after our review of the record, including the declaration from SSgt KV, that there were efficiencies missed during the post-trial processing of Appellant's case. That said, we recognize that the transcript and record of trial are large and include some sealed material. Indeed, the transcript and record of trial spanned 1,599 pages and 11 volumes, respectively. We also note that there is no indication in the record that the delay in docketing this case resulted from government neglect. In fact, both the court reporter's chronology and SSgt KV's declaration indicate that the Government actively worked to timely complete and docket Appellant's record. We do not find any action or inaction on behalf of the Government that was so egregious as to adversely affect the public's perception of the military justice system.

As to the delay in rendering our decision, we note Appellant filed his initial assignments of error on 23 April 2024—399 days after his case was docketed. In his 11 enlargement of time requests—all made over the Government's objection—he acknowledged his right to speedy appellate review and agreed to the delays his counsel requested. Because most of the post-docketing delay in this case was attributable to Appellant filing his brief with this court, we do not find that the delay is one that would adversely affect the public's perception of the military justice system.

 Finally, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). We conclude no such relief is appropriate.

## III. CONCLUSION

The findings and sentence as entered, are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.


DOUGLAS, Judge (dissenting):

I respectfully disagree with my esteemed colleagues as to their conclusion on the first issue. Prosecution Exhibit 7—the recorded conversation between Appellant and JK—was taken in violation of Appellant's rights under Article 31, UCMJ, 10 U.S.C. § 831, and his Fifth Amendment[1] privilege against self-incrimination and should have been excluded at trial. For the reasons set forth below, I conclude that by recruiting JK to solicit incriminating information from Appellant, the Air Force Office of Special Investigations (AFOSI) converted JK into an instrumentality of the Government and rendered her questioning an interrogation for purposes of both Article 31, UCMJ, and the Fifth Amendment. Because the erroneous admission of this evidence included a constitutional violation, I review for prejudice. Considering the extensive use of this exhibit by the Government in prosecuting Appellant, I would find the admission of the recording was prejudicial error.

I believe the military judge incorrectly applied *United States v. Jones*, 73 M.J. 357 (C.A.A.F. 2014), in denying Appellant's motion to suppress. More specifically, the military judge was clearly unreasonable and, therefore, abused his discretion in the application of the second prong of *Jones* to this case.

Recognizing our superior court's two-part test in *Jones*, I think it is important to compare the facts in *Jones*, which led to the judicially created Article 31(b), UCMJ, test, to those of this case. The facts of Appellant's case are distinguishable from those of *Jones* in three important ways. First, in the present case, JK and Appellant were not friends; they had a very limited personal and professional relationship before the night JK went to Appellant's house, and after the fact. In *Jones*, on the other hand, the questioner was a friend of the suspect and in fact had been asked just a week and a half prior to the burglary to assist the suspect and his roommate in the commission of the burglary.

Second, in Appellant's case, JK agreed to solicit incriminating information as part of the AFOSI's official criminal investigation. In contrast, a friend questioned the suspect in *Jones* out of sheer curiosity and personal motivation, but not in an attempt to solicit incriminating responses for the purpose of assisting law enforcement.

Third, in the present case, JK questioned Appellant in a command suite office, behind a closed door, during duty hours, and under the purported authority of command direction. In *Jones*, the friend's questions were asked in a casual environment in a dorm room, in the evening, during off duty hours, where the questioner and suspect had had prior social interactions.

---

[1] U.S. Const. amend. V.

The factual predicate in *Jones*, upon which the United States Court of Appeals for the Armed Forces (CAAF) created the Article 31(b), UCMJ, test, which has remained controlling law in the Department of Defense for 14 years, is, in my opinion, not factually comparable to the case at hand. Put simply, this case is not a case of a traditional "pretext" nor of an informant, where a simple clue or "tip" was provided to law enforcement.

After *Jones*, the CAAF decided another case, *United States v. Ramos*, 76 M.J. 372 (C.A.A.F. 2017); while applying *Jones*, the CAAF provided more guidance as to the second prong of *Jones*. There, Ramos reported to law enforcement a threat of harm he perceived upon himself, his spouse, and the installation writ large, as he and his spouse resided on base. In that law enforcement setting, the CAAF held law enforcement should have stopped the incriminating questioning and informed him of his rights under Article 31(b), UCMJ, when law enforcement realized Ramos was implicating himself in potential crimes. *Id.* at 377. In *Ramos*, the CAAF analyzed the application of Article 31(b), UCMJ, through the two-part test of *Jones* and found both parts in the appellant's favor—excluding his statements to law enforcement, explaining that the totality of circumstances must be considered when applying the second prong of *Jones*. *Id.* at 376.

Again, in my opinion, the facts and circumstances of Appellant's case are starkly different from those which typically arise in a recorded ruse between a suspect and a common informant or undercover agent. *See Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Here, the recorded dialogue was not an ordinary pretext, nor a conversation between peers involving, at most, subtle pressure. *See United States v. Duga*, 10 M.J. 206, 210 (C.M.A. 1981) (citing *United States v. Gibson*, 14 C.M.R. 164, 170 (C.M.A. 1954)) (explaining the purpose of Article 31 is to eliminate the subtle forms of coercion endemic to military life), *overruled on other grounds by Jones*, 74 M.J. at 361–62. Here, JK used her *duties* as a trusted agent of the commander's drug deterrence program to compel Appellant's presence for her questioning of him, which is what *Duga* and *Gibson* warned us about. *Id.*

After carefully considering the evidence in the light most favorable to the prevailing party, I find the trial judge abused his discretion through a clearly unreasonable application of the second prong in *Jones*. Further, the investigative technique employed in this case renders imperative a thorough review of whether the two-part test in *Jones* is a complete and accurate analysis when considering whether Article 31(b), UCMJ, rights advice is warranted.

Special Agent (SA) JB from the AFOSI read Appellant his Article 31, UCMJ, rights on 25 November 2020 concerning the investigation of CG. Appellant initially waived but then invoked his right to counsel, prompting SA

JB to cease questioning Appellant, who thereafter sought legal advice on the CG matter.

Then JK came forward. Upon taking JK's statement, law enforcement could have re-initiated an interview with Appellant after a legally appropriate period of time (*i.e.,* 14 days following their prior custodial interrogation of him) but they did not. *See Maryland v. Shatzer*, 559 U.S. 98, 111 (2010). Instead, law enforcement's next investigative step was to employ JK. This was because, as SA JB testified, in his opinion, JK did not have to give rights advice because she was not a law enforcement agent. JK knew about the allegations made by CG, and specifically sought incriminating answers from Appellant regarding those allegations, including confirmation of the misconduct he had committed upon her. In effect, JK acted as an instrumentality to AFOSI, to do what SA JB thought he could not, *i.e.*, question Appellant further about a matter in which he had invoked "his rights."[2]

In Appellant's particular case, the other party to the dialogue, JK, did not only talk with Appellant about what happened between her and Appellant; rather, she also asked Appellant what happened between him and CG. These questions were framed to elicit incriminating responses about matters for which Appellant had previously exercised his constitutional rights and refused to answer during a formal law enforcement interrogation. *See Rhode Island v. Innis*, 466 U.S. 291, 299–300 (1980) (holding that Fifth Amendment rights advisement was required where law enforcement engages in the functional equivalent of interrogation by utilizing questions designed to elicit an incriminating response).

I would resolve the second prong in Appellant's favor. Twice, Appellant questioned the environment he found himself in when JK asked him to close the door. Appellant asked whether there were microphones in the CSS and whether she had spoken with AFOSI about her allegations against him. Although she told him she had not, Appellant did, and as a reasonable person would, believe, at least at the outset, that this might be an interrogation relating to an official investigation.

The recording makes clear that this was not a casual conversation between friends. This was not a relaxed, back-and-forth conversation; nor was Appellant free from pressure, stress, duress, or coercion, as the majority states. JK compelled Appellant's appearance at her work center by means of a direct

---

[2] The record does not reflect which right, if only one, or all of them, Appellant invoked. SA JB testified he read Appellant his rights and Appellant initially waived, and then invoked his rights. This invocation presumably included the right to remain silent. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

order, by using her duties as a trusted agent. An objective person in Appellant's position would interpret the summons to the CSS office to receipt for an order to provide a urinalysis as a mandatory report, the violation of which would itself subject him to criminal liability under either Article 86 and/or Article 92, UCMJ. 10 U.S.C. §§ 886, 892. In this context, both Appellant and JK were obviously nervous, but for different reasons. All topics discussed were related to Appellant's awareness of his administrative hold due to the sexual assault allegations made by CG; there were no topics raised, even by Appellant, that could be mistaken as any other than that between two people who were both aware of the administrative consequences of being under a criminal investigation, at the end of a military tour of duty.

For the reasons explained above, I would find the trial judge abused his discretion because he clearly unreasonably applied the second prong of *Jones* to Appellant's case.

I would further find the military judge's error was not harmless beyond a reasonable doubt. *United States v. Kreutzer*, 61 M.J. 293, 300 (C.A.A.F. 2005). I considered the Prosecution's evidence at trial. JK testified about what Appellant and her interactions involved. The Prosecution admitted corroborating evidence about certain events which occurred before and after the offenses for which Appellant was convicted. However, there were no other eyewitnesses to Appellant's acts, the acts were not reported for well over a year, and there was no physical evidence. I further considered the Prosecution's extensive reliance throughout its case on Appellant's pretrial admissions. Appellant's incriminating statements were nondescriptive. Some were inculpatory (as to the misconduct asserted by JK) and others were exculpatory (as to the allegations asserted by CG). Significantly, the convictions were consistent with Appellant's admissions: the members found Appellant guilty of the offenses described by JK, and not guilty of the offenses alleged by CG. I am not convinced beyond a reasonable doubt that admitting these pretrial statements did not contribute to the outcome of the case. I would find the error is not harmless beyond a reasonable doubt. *United States v. Evans*, 75 M.J. 302, 305 (C.A.A.F. 2016). I would set aside the findings and sentence and authorize a rehearing.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court