UNITED STATES, Appellee

v.

Stephen A. LLOYD, Senior Airman
U.S. Air Force, Appellant

No. 09-0755

Crim. App. No. 37220

United States Court of Appeals for the Armed Forces

Argued April 6, 2010

Decided June 24, 2010

ERDMANN, J., delivered the opinion of the court, in which STUCKY
and RYAN, JJ., joined.  EFFRON, C.J., filed a separate
dissenting opinion in which BAKER, J., joined.

Counsel

For Appellant:  Captain Reggie D. Yager (argued); Colonel James
B. Roan, and Major Shannon A. Bennett (on brief); Captain
Tiffany M. Wagner.

For Appellee:  Captain Charles G. Warren (argued); Colonel
Douglas P. Cordova, Lieutenant Colonel Jeremy S. Weber, and
Gerald R. Bruce, Esq. (on brief).

Military Judge:  Maura T. McGowan


    **This opinion is subject to revision before final publication.**

United States v. Lloyd, No. 09-0755/AF

Judge ERDMANN delivered the opinion of the court.

A panel of officers sitting as a general court-martial convicted Senior Airman (SrA) Stephen A. Lloyd of three specifications of assault with a dangerous weapon. Lloyd was sentenced to confinement for one year, reduction to E-1, a bad-conduct discharge, and a reprimand. The convening authority approved the adjudged sentence and the United States Air Force Court of Criminal Appeals affirmed the findings and sentence. United States v. Lloyd, No. ACM 37220, 2009 WL 1508442, at *3 (A.F. Ct. Crim. App. May 29, 2009) (unpublished).

"An accused is entitled to an expert's assistance before trial to aid in the preparation of his defense upon a demonstration of necessity." United States v. Bresnahan, 62 M.J. 137, 143 (C.A.A.F. 2005). We granted review in this case to determine whether the military judge abused her discretion when she denied Lloyd's request for the assistance of a blood spatter expert.[1] We hold that the military judge did not abuse her discretion and affirm the Court of Criminal Appeals.

_____

[1] We granted review of the following issue:

Whether the Military Judge abused her discretion when she denied the defense request for an expert consultant in the field of blood spatter.

2

United States v. Lloyd, No. 09-0755/AF

BACKGROUND

The charges in this case arose from a bar fight that pitted SrA Lloyd and his civilian friend, James, against three other airmen, Jance, Gee, and Soto.[2]  When the fight was over, Jance, Gee, and Soto had been stabbed.  The question of who stabbed the three airmen was the central issue at Lloyd's court-martial.

Lloyd did not testify at his court-martial and the individuals who did testify gave differing accounts as to how the fight started.  Airman Jance testified that he, Soto, and Gee were at a bar in Great Falls, Montana, one evening when the man he identified as Lloyd's friend James brushed past Airman Soto and gave Soto the "evil eye."  Jance gave James "the finger" in response.  In contrast to Jance's testimony, James simply testified that he and Lloyd were socializing at the bar when he noticed a man, identified at trial as Jance, about twenty feet away giving him the middle finger gesture.  Unsure of whether Jance was gesturing to him, James pointed to himself in a nonverbal attempt to ask if the man was targeting him. Jance indicated that he was indeed directing the gesture to James.

---

United States v. Lloyd, 68 M.J. 413 (C.A.A.F. 2009) (order granting review).
[2] James's stepfather was an Air Force member and James lived with his stepfather and mother on Malmstrom Air Force Base, Montana, where Lloyd was also stationed.  Airmen Jance, Gee, and Soto were also stationed at Malmstrom.

James testified that he took several steps through the crowded bar towards Jance and when he was about seven feet from him, he asked Jance if he knew him. In response Jance asked James "why are you 'mean mugging' my friend?" James testified that he did not know what the man was talking about. Jance repeated the statement and cursed at James. James testified that Jance then "grinded his face" against him and struck him with his forehead.

According to Jance, however, James started the fight when he walked over to Jance, said "F— you," and "head butted" him. Jance then "head butted" James and the fight was on. James punched Jance on the side of his face and as Jance fell to the ground, James was tackled by Airman Gee. The three of them then scuffled on the floor. James testified that during the fight he could not see any of his surroundings and he assumed that Lloyd was still in another area of the bar.

The third airman with Jance and Gee that night, Airman Soto, testified that when Gee tackled James, Lloyd walked towards the three men but before he could engage in the fight, Soto grabbed Lloyd "from behind and threw him on the floor." Soto continued to hit Lloyd and testified that Lloyd seemed to be hitting him on his side. All participants were on the floor at this point and the two groups of fighters were no more than two to three feet apart.

The fight was broken up by the bouncers and the men were thrown out of the bar. Once outside, the three airmen realized they had each been stabbed and employees of the bar drove them to the hospital. None of the three realized during the fight that they had been stabbed and none of them saw a knife during the fight. James testified that once he and Lloyd were in Lloyd's car, Lloyd told him, "I stabbed those guys." James and Lloyd initially went to Lloyd's home. James testified that he watched Lloyd wash blood off of a knife that Lloyd had been carrying that evening.[3] It was then that James noticed that his own clothes were covered with a "fair amount" of blood although he had not been cut. James testified that his shirt was "[f]airly saturated" and his jeans were soaked in blood. James threw his shirt away in a dumpster outside Lloyd's apartment. The two then went to James's house where Lloyd took off the shirt he was wearing and left it in James's parents' basement.

After hearing a report on the local news that the police were looking for suspects in the stabbing, James testified that he called the Great Falls Police Department to report the incident. Special Agent (SA) Travis Williamson was the lead agent from the Air Force Office of Special Investigations (AFOSI) for the investigation. Williamson had responded to the hospital and interviewed the victims and later interviewed James

---

[3] No knife was ever recovered.

at his stepfather's home.  While at James's home, SA Williamson seized a dark, long-sleeved shirt that James said Lloyd was wearing during the fight to determine whether there was blood on it.[4]  He also seized a pair of jeans that James said he wore during the fight.

In February 2007, seven months before charges were preferred against Lloyd, the seized clothing was sent to the United States Army Criminal Investigation Laboratory (USACIL) for DNA comparison testing.  In order to conduct the DNA testing, the lead biologist at the lab took five cuttings from the shirt.  The test results revealed that Lloyd's shirt had eight blood stains, all of which contained Jance's DNA.  While James's jeans had one blood stain, there was no DNA match with any of the victims' blood.

The charge and its specifications were referred on October 31, 2007.  On January 28, 2008, Lloyd's defense counsel filed a request for expert assistance in the form of a blood spatter expert with the convening authority.  After the convening authority denied the request, defense counsel renewed their request in a motion to the military judge.  In the motion defense counsel argued:

> 15.  A forensic scientist is relevant and necessary
> because the government intends to present testing
> results on DNA as evidence of guilt.  It is

---

[4] When asked if there were blood specks on the shirt, SA Williamson testified that it was "[d]iscolor[ed]."

6

anticipated that the government's expert witness will discuss the location of the blood on the shirt and who matched the DNA contained on the shirt. DNA analysis can only confirm that genetic makeup of physical evidence, not how it came to be on the evidence seized. As a result of that presentation of evidence, the defense is free to explore theories of the case that the government may not be pursuing as it pertains to this relevant physical evidence. That would include exploring all possibilities as to how the blood came to be on the shirt that SrA Lloyd was wearing at the time of the altercation. There are no witnesses in this case who can testify to seeing SrA Lloyd stab anyone. The case hinges upon an alleged confession to an interested party and on blood evidence on SrA Lloyd's clothing. The consultant currently provided to the defense is not qualified to provide information or testify as to bloodstain spatters. . . .

16. To the extent that SrA Lloyd was apparently in the proximity of the area where the altercation occurred, the defense must understand and potentially present expert testimony on the manner in which blood spatters from a stab wound. Depending on a number of factors which the defense intends to pursue through an expert, blood may spatter a significant distance from a stab wound. For this reason, presence of an alleged victim's blood on the clothing may be far less significant than intuition, or even theories the government intends to explore, suggests. To mount an effective defense, the defense must understand the physics of bloodstain patterns to either rule out or present such a theory. This is crucial to testing the government's theory of the case and for the presentation of evidence on behalf of SrA Lloyd. Neither member of the defense has the requisite training or experience to understand this complex field without the assistance of an expert.

The Government responded that the defense failed to articulate a real probability that their requested expert would be of assistance and failed to meet the three-pronged Gonzalez test for expert assistance. The military judge denied the

7

defense motion, concluding, "the defense has not shown the requisite 'reasonable probability' that an expert in blood spatter would be of meaningful assistance to the Defense as opposed to a 'mere possibility.'" The military judge went on to say "[n]otwithstanding that the Defense may have met the second and third prong of Gonzalez this Court determines that a blood spatter expert's assistance is not 'needed' as intended by Gonzalez, supra."[5]

At trial the Government presented testimony from James, Jance, Gee, and Soto. James, Gee, and Soto testified under a grant of immunity. The defense case included testimony from a woman who witnessed the fight and who claimed that she had seen a person matching James's description making a stabbing motion towards Jance but did not see a knife. The Government attacked the credibility of this witness on cross-examination by raising the fact that her testimony was different from the statement she gave police the day after the incident. The defense also presented testimony from an acquaintance of James and from James's former stepfather, with whom James had lived for sixteen years, each of whom characterized James as untruthful. The defense also presented favorable witness testimony to show

---

[5] There was no oral argument on the motion and although the record suggests that there may have been some discussion of the motion in a pretrial Rule for Courts-Martial (R.C.M.) 802 conference, there is no transcript of that discussion. Our

Lloyd's character for peacefulness and submitted thirty character letters.

The USACIL lab results were admitted into evidence through the stipulated testimony of Deborah Haller, lead biologist at USACIL.  Ms. Haller's testimony explained that samples taken from the shirt worn by Lloyd on the evening of the attack matched the blood of Airman Jance.  Her tests also indicated the presence of blood on the jeans worn by James but the blood did not match that of any of the victims.  Haller's stipulated testimony also stated:

> The analysis of DNA and the blood stains on the physical evidence only confirms the physical presence of the sample and who it belonged to.  It does not explain how the blood got on the shirt or what caused the presence of the blood.  The presence of blood on SrA Lloyd's shirt only indicates that he was in proximity to the individual, SrA Jance, who the blood came from.  If the shirt had been analyzed by a blood stain pattern expert prior to collecting cuttings and swabbings for DNA analysis, such an expert may have been able to draw conclusions about the nature of how the blood came to be on the shirt, whether it was smeared, dripped, or was airborne and possibly the distance that it traveled.

## DISCUSSION

A military judge's ruling on a request for expert assistance is reviewed for an abuse of discretion.  Bresnahan, 62 M.J. at 143.  "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's

---

review is therefore constrained to the arguments made by the defense in their written motion.

decision is influenced by an erroneous view of the law." United States v. Freeman, 65 M.J. 451, 453 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" United States v. McElhaney, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting United States v. Miller, 46 M.J. 63, 65 (C.A.A.F. 1997); United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987)).

"An accused is entitled to expert assistance provided by the Government if he can demonstrate necessity." United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001). "[T]he accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." Freeman, 65 M.J. at 458. In order to satisfy the first prong of this test, this court applies the three-part analysis set forth in United States v. Gonzalez, 39 M.J. 459, 461 (C.M.A. 1994). The defense must show (1) why the expert is necessary; (2) what the expert would accomplish for the accused; and (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop. Id.

In her ruling on the defense motion for expert assistance, the military judge concluded "[n]othwithstanding that the

Defense may have met the second and third prong of Gonzalez this Court determines that a blood spatter expert's assistance is not 'needed' as intended by Gonzalez, supra." The Court of Criminal Appeals agreed, holding that "trial defense counsel failed to make the requisite showing of necessity." Lloyd, 2009 WL 1508442, at *2. For purposes of this appeal, we will assume without deciding that the defense met its burden under prongs two and three of the Gonzalez test and review that portion of the military judge's ruling which found the defense did not establish that the expert consultant was necessary.

In the motion for blood spatter expert assistance, defense counsel noted that the Government was likely to present an expert witness to testify about the DNA analysis performed on Lloyd's shirt and the defense needed to present testimony from their expert about how the blood came to be on Lloyd's shirt.[6] The defense argued that a blood spatter expert was necessary to "explor[e] all possibilities as to how the blood came to be on the shirt that SrA Lloyd was wearing at the time of the altercation."

The defense's stated desire to "explor[e] all possibilities," however, does not satisfy the requisite showing of necessity. The defense has the burden to show that there is

---

[6] While the defense was provided with a DNA expert, they did not challenge the DNA testimony.

more than the "mere possibility of assistance from a requested expert." Bresnahan, 62 M.J. at 143 (emphasis added) (citation and quotation marks omitted). The defense must show a "reasonable probability" the expert would assist the defense and that denial of the expert would result in an unfair trial. Id. (emphasis added).

Before the military judge the defense also argued that they needed to "understand and potentially present expert testimony on the manner in which blood spatters from a wound" and "[d]epending on a number of factors which the defense intends to pursue through an expert, blood may spatter a significant distance from a stab wound." The defense suggested that expert assistance on the physics of bloodstain patterns would allow them to "either rule out or present" a theory about the presence of the alleged victim's blood on Lloyd's clothing. However, the defense did not specify what "theory" they sought to present. Absent a more precise explanation of the theory they hoped to pursue through the assistance of a blood spatter expert, we cannot find that the military judge abused her discretion when she denied the defense motion for expert assistance.

This situation is clearly distinguishable from United States v. McAllister (McAllister I), 55 M.J. 270, 276 (C.A.A.F. 2001), where we found that the military judge abused her discretion in denying expert assistance in a case where DNA

United States v. Lloyd, No. 09-0755/AF

analysis was the "linchpin" of the government's case.  In

McAllister I the convening authority had already approved a DNA

expert requested by the defense, but that expert, who

specialized in medical genetics, subsequently recommended that a

forensic DNA expert experienced in Polymerase Chain Reaction

(PCR) testing be substituted.  Id. at 273.  The military judge

refused to allow the substitution even though it would not have

incurred any increased cost to the government.  Id. at 275.

After finding that the military judge abused her discretion in

denying the new expert, we remanded the case to the Court of

Criminal Appeals for additional factfinding as to possible

prejudice.[7]  Id. at 277.  Due to the different factual

circumstances, particularly the fact that the evidence at issue

---

[7] Following remand the Court of Criminal Appeals ordered a
factfinding hearing under the authority of United States v.
DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), to determine whether
the new evidence would have changed the result of the initial
trial.  United States v. McAllister (McAllister II), No. ARMY
9601134, 2003 CCA LEXIS 440, at *26 (A. Ct. Crim. App. Dec. 9,
2003) (memorandum opinion on remand).  The DuBay judge found
that the new evidence would not have changed the member's
findings and the Court of Criminal Appeals affirmed that
determination.  United States v. McAllister (McAllister III),
No. ARMY 9601134, 2005 CCA LEXIS 561, at *31 (A. Ct. Crim. App.
Oct. 28, 2005) (memorandum opinion on remand).  McAllister then
appealed to this court a second time arguing that the military
judge and the Court of Criminal Appeals erred in finding that
the error was harmless.  Finding that the error was not harmless
beyond a reasonable doubt we reversed the Court of Criminal
Appeals.  United States v. McAllister (McAllister IV), 64 M.J.
248, 253 (C.A.A.F. 2007).  In his brief, Lloyd relied on
McAllister IV, but that case dealt with the issue of prejudice,
not whether the military judge erred in denying expert
assistance, which was addressed in McAllister I.

implicated the "linchpin" of the government's case, McAllister I lends little support for Lloyd's position.

In their brief and at oral arguments before this court, appellate defense counsel presented several new and more detailed arguments in support of the expert assistance sought by the defense at trial. Specifically, defense counsel argued that without the testimony of a blood spatter expert, trial defense counsel did not know whether it was necessary to file a motion to suppress the evidence of Lloyd's shirt based on the fact that the Government failed to preserve it when the USACIL biologist cut it up for DNA analysis prior to Lloyd's court-martial.

Appellate defense counsel also argued that the expert's analysis may have established that James was the stabber or may have exonerated Lloyd by explaining the lack of blood spatter on the sleeves of his long-sleeved shirt. According to the appellate defense counsel, "the expert could have offered a favorable opinion that, based on the locations of the wounds, clothing each was wearing, and patterns of blood stains, the blood on Appellant's shirt was consistent with Appellant being in the vicinity of the stabbing rather than being responsible for the stabbing."

These appellate arguments are somewhat more compelling than those presented at trial and had they been explicitly presented to the military judge, they may have persuaded her that a blood

United States v. Lloyd, No. 09-0755/AF

spatter expert was necessary.  In reviewing a military judge's ruling for abuse of discretion, however, we review the record material before the military judge.  We find that the military judge did not abuse her discretion by failing to adopt a theory that was not presented in the motion at the trial level.  See generally United States v. Palmer, 55 M.J. 205, 207-08 (C.A.A.F. 2001) ("If defense counsel had two theories of admissibility, it was incumbent on him to alert the military judge to both theories. . . .").  This is consistent with the general rule that a legal theory not presented at trial may not be raised for the first time on appeal absent exigent circumstances.  United States v. Bowers, 3 C.M.A. 615, 619, 14 C.M.R. 33, 37 (1954) (citations omitted).  Indeed, at oral argument appellate defense counsel conceded that the defense motion for expert assistance "could have been more articulate."

CONCLUSION

The military judge did not abuse her discretion when she denied the defense motion for expert assistance in the form of a blood spatter expert.  The decision of the United States Air Force Court of Criminal Appeals is affirmed.

EFFRON, Chief Judge, with whom BAKER, Judge, joins (dissenting):

Appellant made a specific request for expert assistance necessary for his defense on a central issue in a closely contested case. The military judge erred in denying the defense the equal opportunity to obtain evidence and witnesses guaranteed by Article 46 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 846 (2006). For the reasons set forth below, I respectfully dissent from the majority opinion's decision to affirm the findings and sentence.

The charges against Appellant arose from a barroom altercation. During the evening of the incident, Appellant's civilian acquaintance, Stafford Joseph James Jr., initiated the altercation by confronting Airman Jance about a perceived insult. The confrontation degenerated into a fight between James and Jance. Airman Gee joined Airman Jance in the fight with James.

Up to that point, Appellant had not been involved in the altercation. Eventually Appellant walked toward the fighters, and was intercepted by Airman Soto, who threw Appellant to the floor, and a fight ensued. All the fighters were in close proximity.

After a brief period, roughly fifteen seconds, the bar's bouncers broke up the fight. Appellant and James left through

one door, while Airmen Jance, Gee, and Soto left through a separate door. Outside the bar, the three airmen noticed that they had been stabbed.

Who inflicted the wounds on the three Airmen? Was it Appellant, or was it his civilian acquaintance, Stafford Joseph James? The three victims stated that they did not feel stab wounds during the fight, and they had not seen a knife during the fight. None of the witnesses to the incident saw a knife, and no knife has been recovered. Only one of the three -- Airman Soto -- recalled being touched by Appellant. Two of the three -- Airman Jance and Airman Gee -- recalled fighting with James, but did not recall seeing Appellant. A person who witnessed the fight recalled seeing an individual wearing the same attire as James making stabbing motions toward Airman Jance during the fight.

Stafford Joseph James, the person who initiated the altercation, became the primary source of evidence against Appellant. When James heard on the news that the local police were looking for suspects in the incident, James called the police department to report that Appellant was the perpetrator. According to James, Appellant told James about the stabbings after the incident. The police obtained a shirt that James identified as having been worn by Appellant during the fight. A subsequent DNA analysis of the shirt provided by James

2

identified a match to Airman Jance's blood. James stated that his own shirt was "fairly saturated" with blood, but that he threw it away, and it was never tested for a DNA match with the victims' blood. James also provided the police with a pair of pants, stating that he wore the pants during the fight. Subsequent testing identified a single spot of blood on the pants, but the blood did not match the DNA of any of the victims. Later, James would testify at trial that his pants were soaked in blood through to his boxers, which raised questions at trial as to whether the pants he provided to the police, with the single spot of blood, were in fact the pants that he wore during the fight.

The investigation led to charges that Appellant had stabbed the three Airmen with a knife. From the outset, the defense sought expert assistance to address the central question raised by the charges -- who inflicted the knife wounds? In the military justice system, the prosecution and the defense "shall have equal opportunity to obtain witnesses and evidence." Rule for Courts-Martial (R.C.M.) 703(a); see Article 46, UCMJ. Prior to trial, the defense counsel asked the convening authority to appoint a blood spatter expert to provide assistance to the defense. See R.C.M. 703(d). The convening authority denied the request.

At trial, the defense moved that the military judge approve the appointment of a blood spatter expert to assist the defense. The defense motion noted that the Government planned to present the results of DNA testing to show the genetic identity of blood on Appellant's shirt. The defense emphasized the difference between identification of genetic identity and explanation of the cause of blood spattering on the shirt:

> DNA analysis can only confirm that genetic makeup of physical evidence, not how it came to be on the evidence seized. . . . [T]he defense is free to explore theories of the case that the government may not be pursuing . . . [and] explor[e] all possibilities as to how the blood came to be on the shirt that SrA Lloyd [Appellant] was wearing at the time of the altercation.

The defense explained why the DNA expert provided by the Government would not suffice with respect to identifying the circumstances that led to the bloodstain on Appellant's shirt:

> There are no witnesses in this case who can testify to seeing SrA Lloyd stab anyone. The case hinges upon an alleged confession to an interested party and on blood evidence on SrA Lloyd's clothing. The [DNA] consultant currently provided to the defense is not qualified to provide information or testify as to bloodstain patterns.

The defense also explained the specific, highly relevant analysis that could be provided by a blood spatter expert:

> [T]he defense must understand and potentially present expert testimony on the manner in which blood spatters from a stab wound. . . . [B]lood may spatter a significant distance from a stab wound. . . . To mount an effective defense, the defense must understand the physics of bloodstain patterns to either rule out or present such a theory.

The military judge denied the motion, concluding that the defense had shown only a "mere possibility" that an expert would provide meaningful assistance, which fell short of the requirement to show a "reasonable probability" of necessity under United States v. Gonzalez, 39 M.J. 459, 461 (C.M.A. 1994). United States v. Bresnahan, 62 M.J. 137, 143 (C.A.A.F. 2005). The case then proceeded to trial. The defense presented the theory that the bloodstain on the shirt did not prove that Appellant caused the bleeding, but was forced to do so without expert testimony regarding the potential reasons for the blood spatter on his shirt.

The majority opinion would affirm on the ground that the defense motion established only a "mere possibility" that an expert was necessary. United States v. Lloyd, __ M.J. __ (12) (C.A.A.F. 2010). I respectfully disagree. The defense's motion explained the need for an expert in clear and compelling terms: (1) no witnesses saw the Appellant stab anyone; (2) the primary evidence against Appellant consisted of statements by a person, Stafford Joseph James, interested in the outcome of the investigation; (3) the expected DNA testimony, and the DNA expert provided to the defense, could only establish the genetic source of the bloodstain on Appellant's shirt and could not explain the physics of what may have caused the blood to spatter on the shirt; and (4) expert assistance would enable the defense

5

to determine whether expert testimony would be available to explain that the bloodstain could have been caused by a wound producing a spatter emanating a significant distance from Appellant's location in the altercation. The facts proffered in the defense motion demonstrated that a "reasonable probability exist[ed] 'both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.'" Bresnahan, 62 M.J. at 143 (quoting Gunkle, 55 M.J. at 26, 31 (C.A.A.F. 2001)).

Who stabbed the three airmen? No one saw any stabbing. No one saw a knife. None of the victims felt any stabbing during the altercation. Was it Stafford Joseph James, the person who started the altercation, fought with two of the victims, destroyed his own blood-soaked shirt before it could be tested, whose pants did not match his previous testimony and had no blood from the altercation on him, did nothing to report the incident until he heard about the police investigation, and then immediately placed the blame on Appellant? Or was it Appellant, who belatedly entered the altercation, was identified as being in a fight with only one victim, and whose admissions were attributable to Stafford Joseph James?

The responsibility for sorting out the facts rested with the court-martial panel. The opportunity to present evidence raising reasonable doubt about the Government's case rested with

the defense.  The opportunity for the defense to determine whether such evidence exists in the form of expert testimony is guaranteed by Article 46, UCMJ, and R.C.M. 703.  In this case, the convening authority erred in denying Appellant the opportunity to obtain such assistance, and the military judge erred in denying the defense motion for such assistance.  As a result, the defense was compelled to rely on arguments by counsel drawing inferences from lay testimony without the benefit of scientific evidence regarding the blood spatter patterns.  In a close case, the defense was denied the opportunity to explore the potential for expert testimony on the critical issue of guilt or innocence.  See Gunkle, 55 M.J. at 32.  I would set aside the findings and sentence and order further proceedings to ascertain whether Appellant was prejudiced by the failure to provide the requisite expert assistance.  See United States v. McAllister, 55 M.J. 270, 276 (C.A.A.F. 2001).