# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PENLAND, MORRIS, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist TAYRON D. DAVIS**
**United States Army, Appellant**

ARMY 20220272

Headquarters, 21st Theater Sustainment Command
Charles L. Pritchard, Jr., Military Judge (arraignment)
Thomas P. Hynes, Military Judge (trial)
Colonel Tony Y. Kim, Staff Judge Advocate

For Appellant: Lieutenant Colonel Autumn R. Porter, JA; Jonathan F. Potter, Esquire; Major Bryan A. Osterhage, JA; Captain Jessica A. Adler, JA (on supplemental brief); Colonel Philip M. Staten, JA; Jonathan F. Potter, JA; Major Bryan A. Osterhage, JA; Captain Jessica A. Adler, JA (on supplemental reply brief).

For Appellee: Colonel Richard E. Gorini, JA; Lieutenant Colonel K. M. Bohlke, JA; Major Justin L. Talley, JA; Captain Stewart A. Miller, JA (on supplemental brief).

8 September 2025

------------------------------------------------------
MEMORANDUM OPINION ON REMAND
------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Senior Judge:

When the record before us leaves us with reasonable doubt as to the guilt of the accused, we provide relief by setting aside the findings of guilty. Separately and independently, where a military judge erred in denying a defense motion for expert assistance, then later indicated expert testimony was necessary at trial, significant doubt remains about appellant's opportunity to defend himself, warranting relief.

A military judge, sitting alone as a general court-martial, convicted appellant, contrary to his pleas, of two specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. The military judge

[1] Judge ARGUELLES decided this case while on active duty.

sentenced appellant to a dishonorable discharge and 120 days of confinement. This Court previously set aside the findings and sentence and dismissed the charges with prejudice on other grounds. *United States v. Davis*, ARMY 20220272, 2024 CCA LEXIS 144 (Army Ct. Crim. App. 27 Mar. 2024) (mem. op.). The Judge Advocate General of the Army subsequently certified two issues for review to the Court of Appeals for the Armed Forces [CAAF]. The CAAF reversed this Court's decision and remanded for us to conduct "further review under Article 66, UCMJ, . . . of the claims that were mooted by [our] prior decision to overturn the conviction."

## BACKGROUND

At trial, the alleged victim testified substantially as follows. She and appellant were assigned to the same unit in Stuttgart, Germany, and formed a close friendship over the course of five years. They spent time together, both in group and one-on-one settings, with appellant routinely spending the night at the victim's off-post apartment. On 24 November 2020, appellant came to the victim's apartment with a bottle of alcohol and the pair became intoxicated. During the night, the victim became increasingly uncomfortable with appellant's perceived romantic advances and made several trips to her bathroom to create space. During one of these ventures, she attempted to contact her platoon leader for help. Eventually, a physical altercation broke out over a prior argument and out of appellant's fear that the victim was suicidal. The victim punched appellant, who restrained her. Once appellant released her, she left for the bathroom. After the victim returned, appellant propositioned her for sex, causing her to leave for the bathroom again. When the victim returned to the living room, she found appellant asleep on the sofa. The victim fell asleep next to him but woke up to appellant performing oral sex on her. The victim told appellant to stop and attempted to push him away, but was unable to do so. She finally succeeded in halting the assault when she pulled up her pants and pushed appellant away. Hoping to prevent any further contact, the victim suggested she and appellant go to her room to sleep. After falling asleep, the victim woke up to appellant digitally penetrating her vulva. The victim reported in the following days that appellant sexually assaulted her twice that evening, once on her sofa when she awoke to appellant performing oral sex on her, and the second time, in her bed when she woke up to appellant digitally penetrating her.

Additional witnesses testified substantially as follows. The victim provided three statements to Army Criminal Investigation Division (CID), two formal interviews and one during the course of a walkthrough of her apartment.[2]

---

[2] Significant portions of the victim's statements to CID were admitted at trial during the defense case-in-chief via testimony of the two special agents who conducted interviews with her.

In her first statement,[3] given approximately one week after the sexual assault, the victim described engaging in "heav[]y drinking," resulting in her having "various gaps in her memory or recollection from the evening of the incident." The victim did not mention oral copulation or vaginal penetration, other than stating that appellant attempted to put his hands down her pants after she asked him "to go to her bed to go to sleep."

The victim's second and third statements occurred later and were made to a different CID agent.[4] Like her first interview, the victim recounted being "very intoxicated" with "memory lapses," in addition to "slurred speech" and "stumbl[ing] while walking." She also acknowledged having "anxiety" and inviting appellant "over as a friend" to comfort her and stated that while the appellant physically restrained her, she could not remember how. The victim also told the agent that appellant asked to kiss the victim, which she denied. Unlike before, the victim mentioned that she had fallen asleep on the sofa and woke up to appellant "licking her vagina," and that when she asked appellant to stop performing oral sex on her, "[h]e continued on for a couple of seconds, and then she asked him – and then he stopped after a couple of seconds." Regarding the second assault, the victim remembered waking up to appellant "inserting and rubbing the top of her vagina" with his finger. The next memory she had was waking up the next morning wearing two pairs of pants.[5]

Before trial, defense moved to compel the appointment of a forensic psychiatrist to provide expert assistance on alcohol-induced blackouts. The defense cited the need for expert assistance to support the following:

---

[3] Trial counsel objected when defense counsel asked the agent to "walk . . . through the events of the alleged assault." Though the trial counsel did not characterize his objection as a standing one, defense counsel's response—that the agent's testimony was "being offered for impeachment of what [the victim] told CID"—was broad enough to effectively limit the agent's testimony as if such an objection had been made. As such, we considered the first agent's testimony for the effect, if any, it had on the victim's credibility, not as substantive evidence.

[4] With two exceptions—first, regarding how appellant responded to the victim's demand to stop performing oral sexual acts on her, and second, the reasoning for why the victim did not ask appellant to leave the night of the charged acts—none of the second agent's testimony prompted a hearsay objection. As such, we consider the majority of said testimony substantively.

[5] The victim stated she let appellant stay the night because she did not want him to drive home given his state of intoxication.

(a) [U]nderstanding memory formation and encoding as it relates to the consumption of alcohol; (b) understanding how alcohol affects a person's cognition, and specifically how the alcohol consumed by [the victim] and [appellant] may have impaired their cognitive functions; (c) understanding how alcohol affects decision-making, (d) understanding how alcohol affects sleep and a person's perception of reality if they are awakened in an intoxicated state . . . . [D]efense counsel are not qualified to conduct this analysis.

Defense further stated: "Regardless of defense counsel's research, the Defense will not be able to offer the same opinions [as the expert] . . . . Defense would need additional education that would unreasonably delay this proceeding."

At a motions hearing, the defense expounded on their request for expert assistance. Defense stated that while they could "easily Google or look up these things," they had "no basis, . . . no medical knowledge, to be able to analyze these [issues]" or "be able to tell how it applies to the facts in [the] case . . . ." In response, the military judge queried, "beyond googling the subject, you haven't done anything to understand the impact of alcohol on memory or the difference between a blackout and a pass out; or how alcohol affects people of different genders, body, size, and alcohol tolerance?" While somewhat acquiescing to the military judge's contention, the defense reiterated their need for expert assistance.

The military judge denied the defense motion on 14 April 2022, writing:

The Defense claims that it needs an expert's help to understand alcohol's effects on memory, cognitive function, sleep, and perception of reality if awakened in an intoxicated state. All of this information is *all too common knowledge*, particularly in the world of criminal law. It is so common that there is a standard findings instruction on voluntary intoxication, "The law recognizes that a person's ordinary thought process may be materially affected when he is under the influence of intoxicants."

. . . .

Defense would have an expert do for them what they are expected to do as advocates – assess a witness's ability to perceive events and show how that perception may have been limited through thorough, well-prepared cross examination of that witness.
Defense asserts that it is not educated in the "field of alcohol," or its impact on the body and behavior . . . and requires an expert to decipher "the technical concepts therein." When pressed to describe what it had done to fill this apparent gap in its case preparation, Defense stated that

it had "googled" some of the concepts, but offered nothing more . . . . To the extent that "blackouts" or "pass-outs" are technical concepts, *Defense provided no evidence* that the [victim] either blacked out or passed out, *only that she claims not to remember* some of the events from the night of the alleged assaults. (emphasis added).

At trial, the victim testified she and appellant had been close friends and sometimes joked about engaging in sexual acts with each other. However, sometime prior to 24 November 2020, appellant attempted to do so, which the victim rejected, causing a rift. As a result, appellant and the victim got into an argument and did not speak for months.

On cross-examination, the victim stated:

Defense Counsel [DC]: You ended up drinking quite a bit that night, correct?

Victim [V]: Yes.

DC: So much so that you got pretty intoxicated?

V: I was intoxicated, yes.

DC: So much that your speech was delayed?

V: Yes.

DC: That you were stumbling?

V: No.

DC: You weren't stumbling?

V: No.

DC: Intoxicated so much that you don't remember parts of the night?

V: No.

The victim further testified she could "not recall" portions of her CID interviews, including why she could not disengage from the altercation, whether appellant complied when she said "no" during the assault, or whether appellant digitally penetrated her. The victim also acknowledged that she might have joked to appellant about "threesome[s]," she never expressed interest in him outside friendship, seriously propositioned him for sex, or kissed him.

On redirect, trial counsel admitted several messages sent by the victim to her platoon leader, before the first charged sexual act. These messages included: "I'm terrified at the moment," "Please help," and "Talk to me [please]." Approximately one hour later, additional messages were sent by the victim, including: "Hey motherf***** is being weird[.] I'm about to hit him hard in his face am I crazy? [I don't know] anymore?"

In addition to the victim, the government elicited testimony from two of appellant's friends, who spoke with him the day after the alleged assault. The first friend testified that appellant relayed he and the victim "made out . . . foreplay happened," including his digitally penetrating the victim, "and then they both went to bed naked." The first friend also testified that appellant called the witness for advice because he was "confused" and "blindsided" by the victim's behavior afterwards. The second friend similarly testified appellant called her for advice and discussed the incident with her. According to the second friend, appellant acknowledged performing oral sex on the victim but stated he stopped when asked by the victim. He also told the friend that the pair slept in the same bed immediately after. Like the first friend, the second stated appellant sounded "confused" and appeared to be "blindsided" by the victim's allegations. The victim's platoon leader testified that on 30 November 2020, the victim reported she was sexually assaulted. The platoon leader had also recently received late night Facebook messages from the victim but did not know their content because the victim unsent them.

The defense called six witnesses from appellant's and the victim's friend group or unit. Each witness provided opinion or reputation evidence regarding the victim, testifying that she was untrustworthy and untruthful. One witness testified they heard the victim talk to appellant about sex, and another described previously hearing the victim comment: "I'm going to have sex with [appellant]." Another witness testified that he observed appellant and the victim "grinding" and kissing at a club one night.[6] Lastly, another witness testified appellant and the victim were very close—"two peas in a pod"—and that he was present for multiple instances when the victim discussed finding a third sexual partner to participate in a threesome with appellant.

The defense also called two CID agents, whose testimony – discussed in greater detail above – showed inconsistencies and contradictions in the victim's account.

During closing, defense argued, without objection, "[i]t's a classic fragmentary blackout: [d]oing something and not remember doing it." Defense further emphasized this idea, arguing the alleged victim was "[i]n and out of fragmentary blackout." Government counsel objected: "[c]ounsel is testifying on an

---

[6] The victim acknowledged "grinding" on appellant.

expert issue that defense counsel neither put any evidence into – into play, nor has proper expert qualification to testify to himself." The military judge sustained the objection with the following admonition to the defense:

> You can argue inferences from her lapse in memory; but I think, if you're referring to something that – for example: *I don't know what a fragmentary blackout is.* So, when you say a "classic fragmentary blackout," to the extent that requires some expert testimony to diagnose and explain, I'm not going to consider that. (emphasis added).

## LAW AND DISCUSSION

### *A. Factual Sufficiency*

This Court "may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[7] UCMJ art. 66(d)(1). We conduct a de novo review for factual sufficiency. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). We independently assess whether the evidence at trial proved an appellant's guilt beyond a reasonable doubt. *See id.* We are "limited to the evidence presented at trial." *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007). "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399; *see also* UCMJ art. 66(c).

Our previous decision did not reach the factual sufficiency of the findings of guilty. Considering *United States v. Steele*, 83 M.J. 188 (C.A.A.F. 2023), we do so now, confident our superior court did not intend its remand to this Court as a constraint on our statutory responsibility.

To prove the offense of sexual assault as charged, the government was required to prove appellant "commit[ed] a sexual act upon [the victim] without the consent of [the victim]." UCMJ art. 120(b)(2), (A). In determining whether the victim consented, we look to "[a]ll the surrounding circumstances . . . ." UCMJ art. 120(g)(7)(C), including the intoxication of the victim. *See United States v. Mendoza*, 85 M.J. 213, 222 (C.A.A.F. 2024). Mistake of fact as to consent is a defense to the offenses charged, so long as "the ignorance or mistake. . . existed in

---

[7] Because the offenses for which appellant were found guilty occurred before 1 January 2021, we apply our historic factual sufficiency review. *See United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024).

the mind of the accused" and was "reasonable under all the circumstances." Rule for Courts-Martial [R.C.M.] 916(j)(1).

After carefully examining the record of trial in appellant's court-martial, we are not convinced that his conviction is "correct in . . . fact." The fact appellant engaged in sexual acts with the victim was not contested. The sole issue was whether the victim consented to the charged sexual acts or whether appellant reasonably believed she did. We find that not only did the government fail to establish appellant's guilt beyond a reasonable doubt, but it was unable to disprove the rational hypothesis that appellant reasonably believed the victim consented.

The government's chief witness on the issue of consent was the victim, whose in-court testimony was effectively impeached by her prior statements to CID and witnesses called by the defense.

First, the victim testified with a relatively high degree of specificity regarding the events of November 2020. However, many of these details, including: (1) how appellant restrained her and why, (2) whether appellant performed oral sex on her, (3) whether appellant digitally penetrated her, and (4) why she was wearing another pair of pants, were omitted from her various statements to CID. While this list is neither exhaustive nor dispositive, the omissions, including regarding the details defining the *actus reus* of the charged offenses, is striking.

Second, the victim's credibility was effectively undermined by the testimony of numerous witnesses. Not only did many of these witnesses speak to the victim's reputation regarding truthfulness, they also impeached her by contradiction, identifying specific instances of actual and proposed physical interaction between appellant and the victim that the victim explicitly denied on the stand. In comparison, government witnesses described appellant's reaction after being initially confronted by the victim, described his shock at the allegation. Moreover, there was no indication that he shied away from admitting to these witnesses that he and the victim had engaged in sexual acts.

The victim's testimony about what she could "recall" also raises reasonable doubt. During cross-examination, she specifically denied any partial memory loss about the night in question.[8] Then, asked if she remembered telling a CID agent on 3 December 2020 that she "could not remember parts of the night[,]" she answered, "I don't recall." Asked shortly after whether she said to a CID agent, "I just don't know what [appellant] did that made me feel uncomfortable. I don't know what it was due to me being intoxicated[,]" she answered, "Correct." Then, immediately

---

[8] Q: [Were you] [i]ntoxicated so much that you don't remember parts of the night?

A: No.

after, the defense asked, "Do you remember giv[ing] that statement?" The victim then answered, "I don't recall." The defense asked whether she had said "No" in response to CID's asking her, on 3 December 2020, whether appellant penetrated her vagina with his finger; the victim testified, "I don't recall."

The following is taken from CID Special Agent (SA) █ 's trial testimony in the defense case:

Q: [W]hat did she tell you about her level of intoxication?

A: During the narrative portion, she had described that she had been drinking and I believe she had just described it as "heavily drinking." And, to summarize it in one word, she had said that they were – I believe were pretty drunk in that moment.

Q. [D]id she report any issues with her memory?

A. Yes. She described various gaps in her memory or recollection from the evening of the incident.

Q: [R]egarding specifically the alleged assault: During her narrative portion, did [the victim] mention any penetration?

A: Negative, ma'am.

Q: Did she say anything about mouth-to-vulva contact?

A: Not during my interview. No.

The following is taken from CID SA █ 's trial testimony in the defense case (he interviewed the victim at the CID office on 3 December 2020 and during a "walk-through" of the scene on 18 February 2021):

Q: What did [the victim] tell you about her level of intoxication during the night of the alleged incident?

A: She told me she was very intoxicated. She had memory – memory lapses from that night.

. . . .

Q: Regarding the restraint, did [the victim] report how [appellant] restrained her?

A: She couldn't remember.

Considering these inconsistencies and contradictions, the alleged victim's memory lapses (and her disclaimer of some lapses entirely) render her testimony insufficiently reliable to affirm. What is more, the victim's and witnesses' testimony do not eliminate multiple factual doubts: whether the charged underlying acts occurred; and – if they did – whether they occurred without the victim's consent, or whether appellant was reasonably mistaken. In light of these matters and based on our independent assessment of the record, we are not convinced of appellant's guilt beyond a reasonable doubt, and for that reason shall set aside and dismiss.

### B. Expert Consultant

The military judge's denial of expert assistance to defense separately warrants relief.

"No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend V. Further, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend VI. "Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations and citations omitted). "To rise to the level of constitutional error, a ruling must have infringed upon a weighty constitutional interest of the accused." *United States v. Dimberio*, 56 M.J. 20, 26 (C.A.A.F. 2001) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

A military accused is entitled to government-provided expert assistance upon a showing of its necessity. R.C.M. 703(d)(1); *see also, e.g., United States v. Tinsley*, 81 M.J. 836, 841 (Army Ct. Crim. App. 2021). To prevail, an appellant must establish that "a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of the expert assistance would result in a fundamentally unfair trial." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (internal quotations and citation omitted). To determine whether expert assistance would benefit defense and establish necessity, courts consider: "First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why . . . the defense counsel [was] unable to gather and present the evidence that the expert assistant would be able to develop." *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994). However, there must be "more than the 'mere possibility of assistance from a requested expert.'" *Lloyd*, 69 M.J. at 99

(quoting *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005)).[9] Instead, there must be a "reasonable probability" that expert would assist defense. *Bresnahan*, 62 M.J. at 143.[10] Finally, defense counsel must show that they have "educated[d] themselves to attain competence in defending an issue presented . . . ." *United States v. Kelly*, 39 M.J. 235, 238 (C.A.A.F. 1994).

This Court reviews a military judge's decision denying defense's request for expert assistance for an abuse of discretion. *Lloyd*, 69 M.J. at 99 (citing *Bresnahan*, 62 M.J. at 143). An abuse of discretion occurs when the military judge: "(1) predicates his ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) fails to consider important facts." *United States v. Becker*, 81 M.J. 483, 489 (C.A.A.F. 2021) (quoting *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017)) (internal quotations omitted).

On this topic, it is necessary to specifically comment on the leading argument from appellee's brief. We offer two general observations initially. First, litigants occasionally try to unilaterally restyle their opponents' arguments in a manner that makes it (at least ostensibly) easier to understand. Second, whatever one might think of that approach, a litigant creates their own uphill climb when they restyle with a strawman. This appeal exemplifies these points, where the government urges that "[a]ppellant is not entitled to expert assistance just because the facts involve alcohol and sex . . . ." Appellant's complaint is not as simple as the government asserts.

We need not achieve a detailed understanding of alcohol-induced blackout to decide this case. This is fortuitous, for an in-depth understanding would require a level of knowledge of physiological processes that we do not possess. In other words, such understanding would require expert assistance and explanation. We hasten to emphasize what we are not saying: we are not saying expert assistance was necessary to help the defense know *that* blackouts can happen. Instead, we are saying that – based on this record – the defense established that expert assistance

---

[9] Defense counsel need not "explore all possibilities" to meet the "necessity" prong of the *Gonzalez* factors. *See Kelly*, 39 M.J. at 238.

[10] The military judge must decide "whether the probative value of evidence is 'substantially outweighed by the danger of unfair prejudice . . . .'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009). The probative weight of evidence cannot be weighed in a vacuum but must be evaluated based on the basis for which it was offered.

was necessary to help them understand *how* they happen.[11] Only then could they responsibly evaluate – guided by professional norms – whether the evidence in the case was consistent with *how* they happen, so they could then perhaps seek an expert witness to explain it to the court-martial. The military judge's own words in response to the government's objection to closing argument illustrate the problem, where he disclaimed knowing what a fragmentary blackout was.[12] The defense was caught in a textbook example of Catch-22: the military judge denied expert assistance because he assessed the topic as "all too common," then he denied the defense's inferential argument[13] on the same topic because, according to the judge, defense counsel was impermissibly trying to testify as an expert.

The military judge's decision was outside the bounds of reasonable judicial discretion. His finding that the defense had provided no evidence of an alcohol-induced blackout was clearly erroneous and, on its own, constitutes an abuse of discretion. Whether one characterizes them as conclusions, findings of fact, or a mixture of both, his multiple assertions that knowledge of alcohol-based blackouts is "common" was equally unsupported by this record. As misplaced his reference to a Benchbook *mens rea* instruction was, the reference itself contradicted his "common" knowledge finding/conclusion – for the effects of intoxication are apparently not so commonly-known, such that a military judge is required to describe them in panel instructions. In light of the information the defense provided the military judge before trial – the victim's alcohol consumption, intoxication, and report of memory gaps to law enforcement – and the specialized knowledge required to understand the physiological processes of how blackouts happen – we also find he clearly missed the mark in ruling that the defense had not established the necessity of expert assistance, or its centrality to the defense and a fair trial.

In *United States v. McAllister*, our superior court held that a military judge's erroneous ruling denying appellant expert assistance deprives him of the right to present a defense, "a fundamental element of due process of law." 64 M.J. 248, 252 (C.A.A.F. 2007) (citations omitted). Accordingly, we review such errors under the constitutional harmless error standard, which requires the government to demonstrate that the error is harmless beyond a reasonable doubt such that there is no reasonable probability it contributed to the contested findings of guilty. *Id.* at

---

[11] We stress that our analysis is limited to the facts of this record. This opinion should not be read as mandating expert assistance merely based on the presence of alcohol.

[12] This declaration was peculiar, considering the military judge's conclusion before trial that the defense had presented no evidence of a blackout – an assertion one could only make if familiar with the concept of blackout.

[13] We also hold the military judge clearly erred in determining defense counsel was testifying, rather than commenting on the evidence.

252-53. The government has not met that burden, where the record leaves open the distinct possibility of a different verdict had the defense received the requested expert assistance. On this basis alone we shall set aside the findings. But for our factual sufficiency analysis, which amounts to an appellate acquittal requiring dismissal of the charge and specifications, we would order a rehearing.

## CONCLUSION

The findings of guilty and the sentence are SET ASIDE. The Charge and its Specifications are dismissed.

Judge ARGUELLES concurs

Judge MORRIS, concurring in part and dissenting in part;

Though I agree that the problem created by the military judge regarding defense access to expert assistance warrants the finding of guilty being set aside, I respectfully disagree with my colleagues regarding their factual sufficiency analysis.

Before turning to why I find this case factually sufficient, I will briefly address our superior court's remand for "further review under Article 66, UCMJ, 10 U.S.C. § 866 (2018), of the claims that were mooted by the lower court's prior decision to overturn the conviction." On a remand from our superior court, we "'can only take action that conforms to the limitations and conditions prescribed by the remand.'" *United States v. Riley*, 55 M.J. 185, 188 (C.A.A.F. 2001) (quoting *United States v. Montesinos*, 28 M.J. 38, 44 (C.M.A. 1989)). While factual insufficiency was not a specific claim of appellant's in this case, it was certainly an issue this court had the statutory authority and mandate to review under Article 66, Uniform Code of Military Justice, 10 U.S.C. § 866 (2018) [UCMJ], which was mooted by the initial conclusion that a non-impartial judge presided over appellant's court-martial. It would seem unusual to test for factual sufficiency the record of a trial that was deemed fundamentally unfair. As such, the issue was mooted by the original disposition and after reversal, the review is arguably within the mandate of our superior court.

We conduct factual sufficiency review de novo, *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002), independently determining whether "the evidence [at trial] prove[d] appellant's guilt beyond a reasonable doubt." *Id.* (internal citations omitted). Though we conduct a "fresh, impartial look at the evidence," we may still bear in mind "the fact that the trial court saw and heard the witnesses." *Id.*; *see also* UCMJ art. 66(c).

13

Considering the evidence at issue, I give a great degree of credence to the military judge who "saw and heard the witnesses" in appellant's court-martial.[14] The crucial, relevant testimony in this case came from in-court testimony. The military judge observed each witness testify and, crucially, was able to make credibility determinations about each. This includes the numerous witnesses who attacked the victim's reliability and truthfulness. Ultimately, the military judge found these attacks unpersuasive and found appellant guilty of both charged instances of sexual assault.

Examining the record de novo, I believe the evidence proved appellant's guilt beyond a reasonable doubt. The victim testified clearly that she: (1) declined appellant's romantic advances, first a kiss, then a proposition for sex, (2) contemporaneously reached out to her platoon leader for assistance with the uncomfortable situation she was in with appellant, and (3) physically and verbally articulated non-consent to appellant.

While the majority accurately highlights the numerous interactions and conversations between the victim and appellant preceding the charged sexual assault, none of these interactions or conversations provide evidence of consent or establish why appellant's mistake of fact existed or was reasonable. In fact, in light of the victim having previously rejected his coaxing her into sexual activity, he should not have expected this night to be any different. I further find the relevance of that evidence to be weakened by the temporal space between those words or actions and the charged misconduct. Put another way, while the victim may have, months previously, indicated a sexual interest in appellant, on the night of the charged misconduct she made her lack of interest in appellant's sexual advances quite clear. It is also important to note that the time between those prior comments and the assault were interrupted by an argument between appellant and victim over the same subject. This disagreement was so intense that it resulted in two close friends not speaking for several months.

Relevant to consent on the night in question, is evidence that before either appellant or the victim fell asleep, appellant directly requested to initiate sexual activity multiple times and the victim never acquiesced. Instead, she left the room, sent messages to her platoon leader and only returned to the living room after appellant had fallen asleep. She then sat upright on her couch to watch television, near where appellant was sleeping, fell asleep and woke up to appellant performing oral copulation on her. Once she realized what was happening, she immediately told him to stop, which he did reluctantly after a few more seconds. Then, in an ill-advised attempt to remove herself from the area, she told appellant they should go to

---

[14] Under our new factual sufficiency standard, we would be *required* to give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence . . . ." UCMJ art. 66(d)(1)(B)(i)(I) (Supp. III 2019-2022).

her room to go to sleep, which they did, only for her to be awoken once again to find appellant digitally penetrating her. Once she stopped the assault, she put on an extra pair of pants and went back to sleep. Even if her testimony was that she did not recall how or why she put on two pairs of pants, it is unlikely that consenting to sexual activity includes putting on additional clothes.

The majority also highlights the victim's testimony under cross-examination that she did not recall certain aspects of her previous statements to CID. I would find the victim's failure to recall in these instances was less an issue of deception and more a challenge with the defense counsel's likely purposefully confusing examination technique. Even SA █ remarked during his direct examination that defense counsel was "jumping all over the place." Specifically, defense counsel never asked her what happened during the assault, instead, his questions were centered on what she might have said about the incident to a specific CID agent on a specific day. Considering the passage of time between those statements and her testimony at trial, it is understandable that she might have a hard time remembering exactly what details she conveyed on a specific day.

Again, when credibility is at issue, I give deference to the military judge who "saw and heard" the witnesses. *E.g.*, *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015), aff'd on other grounds, 76 M.J. 224 (C.A.A.F. 2017); *see also United States v. Crews*, ARMY 20130766, 2016 CCA LEXIS 127, at *11-12 (Army Ct. Crim. App. 29 Feb. 2016) (mem. op.), aff'd 76 M.J. 350 (C.A.A.F. 2017) ("The deference given to the trial court's ability to see and hear the witnesses and evidence – or "recogni[tion] as phrased in Article 66, UCMJ – reflects an appreciation that much is lost when the testimony of live witnesses is converted into the plain text of a trial transcript . . . . [The factfinder] hears not only a witness's answer, but may also *observe* the witness as he or she responds." (emphasis and first alteration in original)).

Further, notwithstanding the majority's findings, I disagree the victim's credibility was undermined by the group of appellant's friends who testified that she had a character for untruthfulness. Reasonable inferences from the testimony of at least two of these people was that they were surprised when appellant told them his version of what occurred that night. Despite the public flirtations between appellant and the victim, neither person expected them to act on the behavior, it simply was not taken seriously, which is in line with the victim's characterization of their sexual banter. Not to mention, just as the majority highlights the victim's failure to recall certain details during cross-examination, it is important to point out appellant told different stories to each of his friends about what occurred that night as well, admitting to only one sexual act to each individual person.

Based on the surrounding circumstances, I would find the government proved beyond a reasonable doubt the victim did not consent to either sexual act. I would

also find even if a mistake of fact somehow existed in appellant's mind, it was not reasonable. While the victim, in some instances, did not vocalize her internal thoughts to appellant, the verbal and nonverbal communication she did share was sufficient to deflate any reasonable mistake of fact appellant may have had as to the victim's consent.[15] The victim specifically testified that each assault was initiated while she was asleep. At no time, during this evening did she accept any of his direct offers to initiate sexual activity and it is undisputed she had never accepted any of his prior offers to engage in sexual activity. Thus, it was not reasonable for him to think she was going to consent, which was confirmed by her actions each time she was awakened by the assault in-progress. Accordingly, I would find appellant's conviction factually sufficient and would order a rehearing to address the error created by the military judge's denial of the defense request for expert assistance.

FOR THE COURT

JAMES W. HERRING, JR.
Clerk of Court

---

[15] For instance, I draw particular attention to the fact that appellant propositioned the victim for sex, which she declined, before leaving the room. Upon her return, the victim fell asleep sitting on the sofa next to appellant. She was then woken up by appellant performing oral sex on her. Given the victim's specific, prior declination, it was unreasonable for appellant to believe that she would have consented to this sexual act.